UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

KAYSON PEARSON,

                    Plaintiff,

      vs.

ANTHONY J. ANNUCCI, Acting Commissioner, Department of Corrections and Community Supervision; DR. JOHN MORLEY, DOCCS Deputy Commissioner & Chief Medical Officer; JAMES O'GORMAN, Deputy Commissioner for Correctional Facilities; DR. CARL KOENIGSMANN, former DOCCS Deputy Commissioner & Chief Medical Officer; JOSEPH BELLNIER, former DOCCS Deputy Commissioner for Correctional Facilities; JOHN COLVIN, Superintendent of Five Points; MATTHEW THOMS, Superintendent of Mid-State; STEWART T. ECKERT, Superintendent of Wende; DONALD VENETTOZZI, Director of DOCCS Special Housing and Inmate Disciplinary Program; JOHN or JANE DOES 1–5, members of the DOCCS SHMC at Five Points; JOHN or JANE DOES 6-10, members of the DOCCS SHMC at Mid-State; and JOHN or JANE DOES 11-15, members of the DOCCS SHMC at Wende,

                    Defendants.

_____

Case No. 9:20-cv-1175-TJM-TWD

**FIRST AMENDED COMPLAINT**

**JURY TRIAL REQUESTED**

     Plaintiff Kayson Pearson ("Plaintiff" or "Mr. Pearson"), by his counsel Sidley Austin LLP, as and for this Complaint, alleges the following:

**INTRODUCTION**

     1.     This is a civil rights action for declaratory relief as well as compensatory and punitive damages, under 42 U.S.C. § 1983 ("Section 1983") for violations of Mr. Pearson's rights to due process under the Fourteenth Amendment of the Constitution of the United States and to be free from cruel and unusual punishment under the Eighth Amendment of the Constitution of the United States.

1

2.      For thirteen consecutive years, Mr. Pearson was subjected to long-term, cumulative, and continuous punishment by being placed in solitary confinement[1] while in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"). During this time, Mr. Pearson was confined in extreme isolation in an 8-foot by 14-foot concrete cell for at least 22 hours a day and was deprived of basic human needs.

3.      Mr. Pearson's cell was often unsanitary, cold, and was constantly illuminated, day and night. Mr. Pearson was denied any meaningful human contact with fellow prisoners, friends or family and was effectively denied regular access to outdoor activity as well as access to religious, vocational, recreational, and educational programs.

4.      DOCCS, through the acts and omissions of each of the Defendants, subjected Mr. Pearson to these conditions without any meaningful review of his status and despite the fact that Mr. Pearson never faced any additional discipline during his time in DOCCS and was reported to have adjusted well and behaved positively. Mr. Pearson's time in solitary confinement was based on a single violent incident in 2006 that occurred before his sentencing. His behavior while incarcerated did not warrant his extreme isolation. Indeed, his reviews reflect that he was stable,

---

[1] Mr. Pearson uses the term "solitary confinement" to refer to his confinement in the Special Housing Unit ("SHU") under administrative segregation ("Ad Seg") status as well as his time in the step-down program. Because the conditions of Ad Seg and the step down program were virtually identical for Mr. Pearson, *infra* ¶¶ 46-49, the terms "Ad Seg" and "solitary confinement" are used interchangeably herein to apply to Mr. Pearson's time in Ad Seg and the step-down program.  The National Commission on Correctional Health Care ("NCCHC") similarly defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."  National Commission on Correctional Health Care, Position Statement on Solitary Confinement (Isolation) (2019), available at http://www.ncchc.org/solitary-confinement. This confinement has other names, including isolated confinement, extreme isolation, segregation, room restriction, and SHU, but, in all cases, the prisoner experiences the same harmful isolation and other deprivations.

quiet, and cooperative. During his time in solitary confinement, Mr. Pearson never showed himself to be a threat to the safety and security of the prison.

5.    It is well established that prolonged solitary confinement causes severe harm and has compounding negative effects, especially on the young, disabled, and mentally ill. Nevertheless, DOCCS subjects thousands of New York State prisoners to prolonged solitary confinement.

6.    Mr. Pearson's years of solitary confinement have caused him and continue to cause him to suffer lasting physical and emotional trauma. While in solitary confinement, Mr. Pearson experienced medical issues that went untreated for months. Mr. Pearson's already tenuous mental health continued to deteriorate during the years he spent in solitary confinement. Mr. Pearson has a history of suicidal ideation, and he suffers from paranoia, anxiety, and depression. He attempted suicide while at Upstate Correctional Facility in 2011 and was sent to the Office of Mental Health Satellite Unit of the New York Psychiatric Center ("OMH") at Clinton Correctional Facility for observation. Yet not a single one of the Defendants took any corrective action to place him in a less restrictive environment or provide him with appropriate mental health treatment. Mr. Pearson remained in solitary confinement for nearly a decade after his suicide attempt.

7.    As a result of substantial recent litigation challenging Ad Seg, media coverage and publications describing the inhumane conditions of Ad Seg, and complaints from prisoners including Mr. Pearson, each of the Defendants was well aware that long-term solitary confinement constituted a cruel and unusual deprivation of Mr. Pearson's liberty.

8.    Each of the Defendants had the authority, through the ability to implement DOCCS policies and practices and through direct responsibility and review of Mr. Pearson's

status, to transfer Mr. Pearson to a less restrictive environment, to provide him with appropriate mental health treatment, and to ensure that during his time in solitary confinement he received meaningful and timely reviews of the extreme conditions of confinement he was subjected to.

9.    Instead, through their policies and practices as well as other acts and omissions, each of the Defendants subjected Mr. Pearson to solitary confinement for an unreasonable and unconstitutional length of time. Through their policies and practices as well as other acts and omissions, each of the Defendants failed to provide Mr. Pearson with adequate due process regarding the review of his administrative and/or disciplinary punishment (which stemmed from a single incident), instead effectively rubber-stamping that extremely severe punishment for over 10 years.

10.    Mr. Pearson continues to face the possibility of being returned to the unconstitutional solitary confinement conditions described herein. Accordingly, along with monetary compensation for Defendants' egregious constitutional violations, Mr. Pearson is entitled to a declaration from this Court that Defendants' actions and omissions violated the Constitution.

## JURISDICTION AND VENUE

11.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, by virtue of claims under 42 U.S.C. §§ 1983 and 1988, as well as the Eighth and Fourteenth Amendments of the Constitution of the United States. Moreover, the Court can order declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. This Court has the authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

12.     Venue is proper within this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events constituting Mr. Pearson's claims have taken place within this district while he was imprisoned at Five Points Correctional Facility.

## PARTIES

13.     Plaintiff KAYSON PEARSON is a 38-year-old man who suffers from various mental health and physical ailments, and is presently held in DOCCS custody at Wende Correctional Facility ("Wende") in Alden, New York. Mr. Pearson was confined at Upstate Correctional Facility ("Upstate") from December 15, 2006 to May 23, 2016; at Five Points Correctional Facility ("Five Points") from May 26, 2016 to January 11, 2018; at Wende from January 11, 2018 to April 17, 2018; and at Mid-State Correctional Facility ("Mid-State") from April 17, 2018 to June 2019.  On information and belief, Mr. Pearson was transferred back to Wende when he was finally released into the general prison population in June 2019, and he has since been confined at Wende.  In addition, while at Upstate, Mr. Pearson was taken to Clinton for a five day period of mental health observation, from June 15 to June 20, 2011.

## DEFENDANTS

14.     At all times relevant to Mr. Pearson's causes of action, each Defendant named herein was employed by, and acted under color of law of, the State of New York.

i.  *DOCCS Commissioner Defendants*

15.     ANTHONY ANNUCCI, as Acting Commissioner of DOCCS (since approximately April 2013), is responsible for overall management and operation of DOCCS, including the care, custody, and control of all prisoners housed in DOCCS facilities, and assuring compliance with state and federal law. The DOCCS Commissioner has final policy-making and

supervisory authority within DOCCS and was at all relevant times responsible for authorizing and maintaining the unconstitutional policies and customs challenged by Mr. Pearson.

16.    Defendant Annucci is aware of the unconstitutional policies and practices used by DOCCS to keep inmates in solitary confinement for lengthy periods of time. As a defendant in *Peoples, et al. v. Annucci, et al.*, No. 11 Civ. 2694 (S.D.N.Y. Apr. 18, 2011), Defendant Annucci is well aware of claims filed by inmates subjected to lengthy periods of confinement in SHU and the resulting unconstitutional risk of harm to inmates in Ad Seg.[2]  On information and belief, Defendant Annucci has been a named Defendant in at least 10 cases challenging the unconstitutional conditions and practices in connection with DOCCS Ad Seg.[3]  Despite his awareness of the unconstitutional risk of harm to inmates, including Mr. Pearson, Defendant Annucci has failed to remedy the unconstitutional policies and practices that enabled the violations of Mr. Pearson's rights.

17.    The DOCCS Deputy Commissioners, as executive officers of DOCCS, have policy-making and supervisory authority within DOCCS and were or are personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Mr.

---

[2] The DOCCS website recognizes Defendant Annucci's awareness of the ongoing constitutional violations that have occurred and are still occurring in DOCCS administrative segregation. *See* Dep't of Corr. and Cmty. Supervision, *Acting Commissioner Anthony J. Annucci*, (last accessed Feb. 11, 2021, 12:51 p.m.), https://doccs.ny.gov/acting-commissioner-anthony-j-annucci (recognizing Defendant Annucci's "lead role in negotiating the historic special housing unit interim stipulation with New York Civil Liberties Union" which imposed "disciplinary guidelines for hearing officers to apply with all infractions").

[3] *See, e.g.*, *Smith v. Annucci*, No. 6:18-cv-06261 EAW, 2019 WL 539935 (W.D.N.Y. Feb. 11, 2019); *Paykina ex rel E.L. v. Lewin*, 387 F. Supp. 3d 225 (N.D.N.Y. 2019); *Lev v. Lewin*, No. 9:19-cv-00061 (N.D.N.Y. Jan. 16, 2019); *Pusepa v. Annucci*, No. 1:17-cv-07954 (S.D.N.Y. Oct. 16, 2017); *Colon v. Annucci*, No. 7:17-cv-04445 (S.D.N.Y. June 12, 2017); *McRae v. Fischer*, No. 9:17-cv-00146 (N.D.N.Y. Feb. 9, 2017); *Williams v. Novak*, No. 9:16-cv-01211 (N.D.N.Y. Oct. 6, 2016); *Bowens v. Smith*, No. 9:11-cv-00784 (N.D.N.Y. July 11, 2011); *Peoples v. Annucci*, No. 1:11-cv-02694 (S.D.N.Y. Apr. 18, 2011); *Proctor v. LeClaire*, No. 9:09-cv-01114 (N.D.N.Y. Oct. 5, 2009).

Pearson. DOCCS Deputy Commissioners include DR. JOHN MORLEY, DOCCS Deputy

Commissioner & Chief Medical Officer; JAMES O'GORMAN, Deputy Commissioner for

Correctional Facilities; DR. CARL KOENIGSMANN, former DOCCS Deputy Commissioner &

Chief Medical Officer; and JOSEPH BELLNIER, former DOCCS Deputy Commissioner for

Correctional Facilities.

18.    Defendant JOHN MORLEY is the current Acting Chief Medical Officer and

Deputy Commissioner of DOCCS. On information and belief, MORLEY is responsible for

overseeing and implementing policies and practices regarding the administration of health

services within DOCCS facilities. On information and belief, MORLEY is responsible for the

medical treatment of prisoners housed in Ad Seg, including Mr. Pearson.

19.    Defendant CARL KOENIGSMANN is the former Acting Chief Medical Officer

of DOCCS and a former Deputy Commissioner of DOCCS. On information and belief,

Defendant KOENIGSMANN was responsible for overseeing and implementing policies and

practices regarding the administration of health services within DOCCS facilities. On

information and belief, KOENIGSMANN was responsible for the medical treatment of prisoners

housed in Ad Seg, including Mr. Pearson.

20.    Defendant O'GORMAN, as the Deputy Commissioner for Correctional Facilities,

is responsible for the overall management and operation of the correctional institutions within

DOCCS. His responsibilities include reviewing and approving periodic reviews for incarcerated

individuals' continuation in, or removal from, Ad Seg.

21.    Defendant BELLNIER was the Deputy Commissioner for Correctional Facilities

from approximately 2011 until his retirement in or about September 2017. He was responsible

for the overall management and operation of the correctional institutions within DOCCS,

including Five Points. His responsibilities include reviewing and approving periodic reviews for incarcerated individuals' continuation in, or removal from, Ad Seg.

22.    Under DOCCS regulations, the DOCCS Deputy Commissioner has the authority to make determinations whether to retain the inmate in solitary confinement or to release the inmate from Ad Seg.[4] On information and belief, on at least one occasion since September 2017, each of the DOCCS Deputy Commissioner Defendants named above, as mandated by New York regulations, reviewed, approved, and signed-off on the disciplinary review boards' continued decisions to keep Mr. Pearson confined in solitary confinement, in knowing disregard of the lack of penological justification for such confinement.

23.    Furthermore, each of the DOCCS Commissioner Defendants has been on notice of the constitutional violations suffered by inmates, including Mr. Pearson, who have been subjected to prolonged confinement in Ad Seg. Not only does state regulation mandate their involvement in the review of Ad Seg, but a number of these DOCCS Commissioner Defendants have been named as defendants in similar challenges to the unconstitutional practices surrounding the confinement of inmates in Ad Seg.[5] The constitutional violations of the rights of

---

[4] *See* 7 N.Y.C.R.R. § 301.4(d)(3).
[5] *See, e.g.*, *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355 (N.D.N.Y. 2020) (asserting claims presenting triable issues of whether defendants, including O'Gorman and Bellnier, violated inmate's due process and Eighth Amendment rights by inmate's prolonged solitary confinement).

inmates confined in Ad Seg is well documented both within and outside the legal community,[6]

putting the DOCCS Commissioner Defendants on notice of such violations.[7]

ii. *DOCCS Superintendents*

24.    The DOCCS Superintendents are responsible for the care, custody, and safety of

all prisoners under their immediate jurisdiction. In this role, the DOCCS Superintendents are and

at all relevant times were personally involved in the care, custody, and condition of inmates in

Ad Seg.

25.    Each DOCCS Superintendent managed or manages a DOCCS facility where Mr.

Pearson was housed in the Special Housing Unit ("SHU") and had policy-making and

supervisory authority with regard to all operations at their respective facilities. The DOCCS

Superintendents also review disciplinary hearings that impose punishments to solitary

confinement. The DOCCS Superintendents are and at all times relevant were personally involved

---

[6] *See, e.g.*, Joshua Mann, *Indefinite Solitary Confinement in New York is Finally Put to the Test*, (June 3, 2019), https://theappeal.org/new-york-indefinite-solitary-confinement-is-finally-put-to-the-test/; William Blake, *Voices from Solitary: A Sentence Worse Than Death*, Solitary Watch (Mar. 11, 2013),  https://solitarywatch.org/2013/03/11/voices-from-solitary-a-sentence-worse-than-death/; Erin Durkin, *NYCLU report finds increase in solitary confinement in state prisons*, (Oct. 28, 2019), https://www.politico.com/states/new-york/albany/story/2019/10/28/nyclu-report-finds-increase-in-solitary-confinement-in-state-prisons-1226020 (discussing the increasing use of prolonged solitary confinement in New York prisons and noting the deleterious effects it has on inmates); Jan Ransom, *Beaten and Left in Solitary Confinement, He Thought He Would Die*," N.Y. Times (Oct. 20, 2019), https://www.nytimes.com/2019/10/20/nyregion/rikers-inmates-solitary-lawsuit.html; New York Civil Liberties Union, *Comment on the Proposed Regulations for Disciplinary and Administrative Segregation of Inmates in Special Housing*, (Oct. 28, 2019), https://www.nyclu.org/en/publications/comment-proposed-regulations-disciplinary-and-administrative-segregation-inmates (noting the inadequacies of DOCCS' proposed changes to administrate segregation despite concerns of the "prevalent misuse of solitary confinement").

[7] *Manning v. Griffin*, No. 15-CV-3 (KMK), 2016 WL 1274588, at *7 (S.D.N.Y. Mar. 31, 2016) (noting that "widespread recognition" of constitutional violations "render[ed] it plausible that Defendants . . . were aware that the Plaintiff belong[ed] to an identifiable group of prisoners" suffering deprivations of their constitutional rights)

in the decision to confine inmates to Ad Seg and SHU, including Mr. Pearson.[8]  Under DOCCS

regulations, the Superintendent of each facility is required to make an independent determination

whether to retain the inmate in solitary confinement or to release the inmate from Ad Seg.[9] The

DOCCS Superintendent Defendants are STEWART T. ECKERT, Superintendent of Wende;

JOHN COLVIN, Superintendent of Five Points; and MATTHEW THOMS, Superintendent of

Mid-State. On information and belief, on at least one occasion since September 2017, each of the

Superintendent Defendants reviewed and denied inmates' complaints and grievances submitted

after their disciplinary hearings and approved, reviewed, and signed-off on the disciplinary

review boards' continued decisions to keep Mr. Pearson confined in solitary confinement, in

knowing disregard of the lack of justification for such confinement.

26.     Each of the DOCCS Superintendent Defendants has been on notice of the

constitutional violations suffered by inmates, including Mr. Pearson, who have been subjected to

prolonged confinement in Ad Seg. Not only does state regulation mandate their involvement in

the review of Ad Seg, but the unconstitutional deprivations occurring in DOCCS Ad Seg are

well-known.[10] Furthermore, at least one of the Superintendent Defendants has been named as a

defendant in similar challenges to unconstitutional conditions and practices associated with Ad

Seg.[11]

iii. *DOCCS SHU Defendant*

---

[8] *See id.* § 300.2(a) (stating the Superintendent designates certain areas of the facility as Special Housing Units).
[9] *See id.* § 301.4(d)(2).
[10] *See supra* note 5, 6.
[11] *See, e.g.*, *Zenon v. Downey*, No. 918CV0458LEKATB, 2018 WL 6702851, at *2 (N.D.N.Y. Dec. 20, 2018) (naming Thoms in challenge to administrative segregation).

27.    DOCCS SHU Directors have policy-making and supervisory authority with regard to SHU and the DOCCS disciplinary process. A DOCCS SHU Director's authority includes reviewing, affirming, modifying, or reversing dispositions imposed at Tier III Hearings.[12]  The SHU Director was at all relevant times DONALD VENETTOZZI.

28.    On information and belief, on at least one occasion since September 2017, Mr. Venettozzi reviewed, approved, and signed-off on the disciplinary review boards' continued decisions to keep Mr. Pearson confined in solitary confinement, in knowing disregard of the lack of justification for such confinement.

### iv. *DOCCS SHMC Defendants*

29.    DOCCS utilized a Discretionary Review Committee ("DRC") at each facility to determine whether a SHU prisoner should be granted a time-cut to his SHU sentence under the Superintendent's discretionary authority. Upon information and belief, in April 2013, DOCCS replaced the DRC with the Special Housing Management Committee ("SHMC") to be comprised of a Deputy Superintendent (to serve as a chairperson, lend guidance, and counsel staff), a SHU sergeant, a disciplinary lieutenant, and others designated by the Superintendent. Upon information and belief, while the SHMC is required by DOCCS directives to make "recommendations" to the Superintendent, in practice it regularly exercised *de facto* power over time-cuts because Superintendents regularly rubber-stamped the determination without independent analysis. The SHMC Defendants include JOHN or JANE DOES 1-5, members of the DOCCS SHMC at Five Points during Mr. Pearson's confinement to SHU at that facility; JOHN or JANE DOES 6-10, members of the DOCCS SHMC at Mid-State during Mr. Pearson's

---

[12] "Tier III Hearings" refer to "Supervisor's Hearings" pursuant to 7 N.Y.C.R.R. § 254, which are reserved only for allegations of the most serious behavior. *See* 7 N.Y.C.R.R. § 301.2(a) (describing disciplinary admissions based on "superintendent's (Tier III) hearing").

confinement to SHU at that facility; and JOHN or JANE DOES 11-15, members of the DOCCS SHMC at Wende during Mr. Pearson's confinement to SHU at that facility. On information and belief, the SHMC Defendants JOHN and JANE DOES 1-15 were part of the review committee that made the determination to keep Mr. Pearson confined in Ad Seg despite the lack of penological justification for his continued confinement in solitary confinement.

30.     Each of the Defendants named in this Complaint have been on notice of the constitutional violations suffered by inmates, including Mr. Pearson, who have been subjected to prolonged confinement in Ad Seg. Not only does state regulation mandate their involvement in the review of Ad Seg, but the issues surrounding Ad Seg in DOCCS are well-known among both legal experts and laymen alike.[13]

## STATEMENT OF FACTS

### Early Life

31.     Mr. Pearson was held in solitary confinement by Defendants from 2006 until 2019. He was 24 years old when he entered solitary confinement. He is currently 38 years old.

32.     Mr. Pearson had a chaotic and unstable childhood. Both of Mr. Pearson's parents died of AIDS when he was young. He was placed in foster care at the age of four and adopted by his grandmother, who suffered from an undisclosed mental illness. Mr. Pearson was raised by a series of substitute caretakers at various times and experienced many instances of neglect and abuse throughout his childhood.

### Initial Placement in Administrative Segregation

33.     On August 4, 2004, Mr. Pearson was committed to the care and custody of DOCCS at the age of 24 for rape, sodomy, kidnapping, and murder.

---

[13] *See supra* note 6.

34.    Mr. Pearson was in general population until April 14, 2006. He was housed in Ad Seg until April 12, 2018, when he was placed in a step-down program, which purports to be a transition to less restrictive housing. He was not released into general population until June 2019. Mr. Pearson's placement in Ad Seg was based on a single disciplinary incident that occurred in January 2006 (the "January 2006 Incident") before he was sentenced: While in court on January 18, 2006, Mr. Pearson stabbed his attorney with a plastic knife in an effort to escape custody.

35.    Prison officials have authority to punish prisoners who break prison rules and regulations as well as prisoners who break the law while in prison. Officials may place these prisoners into disciplinary segregation as punishment. However, prisoners may only be placed into disciplinary segregation for a specified time period following a Tier III hearing wherein prison officials must provide the accused inmate with written notice of the charges including the specific date, time, and place of the alleged misconduct as well as enough additional information for the inmate to prepare a defense.

36.    Officials also have the authority to place prisoners into Ad Seg in instances where officials determine that the prisoner threatens the safety and security of the prison. Unlike disciplinary segregation, Ad Seg does not require that the inmate be placed in a special housing unit for a specified time period. Instead, the prisoner is placed into Ad Seg and has his or her status periodically reviewed to determine if continued segregation is warranted.

37.    Mr. Pearson was placed in Ad Seg before he was afforded the opportunity for a hearing. When the hearing was held, it consisted solely of testimony presented by the recommending officer, Deputy Inspector General Seyfert describing the January 2006 Incident.

### Conditions of Solitary Confinement

38.    Mr. Pearson spent 13 years in solitary confinement.

39.     While in Ad Seg, Mr. Pearson was kept under conditions of extreme isolation, sensory deprivation, and restricted movement. Unlike in the general population, he was denied all work, cultural, and social opportunities. He had severely limited recreational and religious opportunities, limited access to personal property, and limited contact with family and friends.

40.     Mr. Pearson was housed in a single-occupancy, 8-foot by 14-foot concrete cell for at least 22 hours per day. The cell was dirty, with dirty water sometimes coming out of the sink. A bright light was kept on at all hours of the day, remaining on even after Mr. Pearson complained to prison officers.

41.     Mr. Pearson was allowed to shower three times a week, although the showers were often without hot water. His cell became cold starting in September each year, but officers told him that the heat could not be turned on until mid-October, so he was cold for weeks at a time every year in his cell.

42.     From 2006 to 2012, Mr. Pearson was allowed only one hour of outdoor recreation each day. From 2012 until his release into general population, Mr. Pearson was allowed two hours of recreation each day. Outdoor recreation took place in a 6-foot by 8-foot empty pen which was enclosed on three sides by solid walls and with one side of mesh fencing. The recreation pen had no equipment or structure to facilitate exercise. Mr. Pearson did not have access to group recreation nor the opportunity to interact with other people, even during these brief periods of recreation. Further, Mr. Pearson's allotted one or two hours of outdoor recreation were often inaccessible due to the cold temperatures in northern New York.

43.     While in Ad Seg, Mr. Pearson was denied access to opportunities for group meals, group education, or group prayer. He received all of his meals through a slot in his door and ate alone in his cell. In addition, Mr. Pearson was not permitted to attend therapeutic groups or

programs for his mental health and behavioral needs. While in the step-down program, Mr.

Pearson was allowed one hour per day, Monday through Friday, of group education. Mr. Pearson

is Jewish, yet for 13 years he was denied the ability to go to synagogue or to light Shabbat

candles in his cell.

44.    Mr. Pearson had minimal human interaction in Ad Seg and in the step-down

program. Typically, his only daily human interaction was with correctional officers or medical

staff for a few minutes at a time. These interactions took place through a small open slot in his

cell; no one came inside Mr. Pearson's cell. A counselor made rounds every day, but if

Mr. Pearson wanted to interact with her, he had to yell out from his cell. For the first nine years

of his time in Ad Seg, Mr. Pearson was permitted one 30-minute phone call per month. This was

later expanded to a single 30-minute phone call per week. Mr. Pearson was allowed to see

visitors – without contact – once a week.

45.    Mr. Pearson was not permitted to interact with other prisoners and could not see

any of the other prisoners. The only way Mr. Pearson could interact with the other prisoners was

to yell from his cell. However, Mr. Pearson does not like to yell and would face disciplinary

sanctions for yelling, so he did not have a chance to talk to anyone at all. Despite this risk, many

prisoners in the SHU do yell to communicate with one another. The constant yelling by the other

prisoners prevented Mr. Pearson from having any prolonged periods without disturbance.

## Placement and Conditions in the Step-Down Program

46.    Mr. Pearson was placed into a step-down program on April 12, 2018. He

remained in this program until he was finally released into general population in June 2019.

47.     The step-down program is supposed to provide a phased transition for individuals in Ad Seg to return to general population. However, despite its name and ostensible purpose, in practice the conditions of the step-down program were identical to Ad Seg.

48.     In the step-down program, as in Ad Seg, Mr. Pearson was confined to his cell for 21 hours a day. He could not speak to or interact with other inmates. He still received only one visit per week, without contact, and was allocated the same privileges with regard to personal property and commissary purchases. His recreation time was still spent alone in a small, concrete block. The only minor difference between Ad Seg and the step-down program was that Mr. Pearson received an additional four hours of inmate programming sessions each week. Mr. Pearson was still chained during the sessions, and he received no additional programming on the weekends, which were spent in complete isolation as in Ad Seg. In addition, the programming consisted mostly of anger management sessions that were tailored to inmates who were frequently being shuffled between general population and a SHU for disciplinary infractions, and Mr. Pearson found the additional programming to be meaningless for an inmate who had been in Ad Seg for over a decade. Moreover, Mr. Pearson did not receive a single review of his confinement status during his time in the step down program. In short, the step down program was no different from Ad Seg.

49.     As a result, Mr. Pearson was subjected to solitary confinement without any meaningful review for a total of 13 years, through his time in Ad Seg and in the equally restrictive step-down program.

### Medical and Mental Health Consequences of Solitary Confinement

50.     Mr. Pearson has serious mental health conditions, which have been caused and exacerbated by his 13 years of solitary confinement.

51.    Mental health professionals have repeatedly and strongly cautioned against the use of solitary confinement in light of the serious, often irreversible, damage it causes. Common side effects of prolonged solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors.[14]

52.    The most devastating consequence of solitary confinement is the high risk of self-harm. The American Psychiatric Association has warned that prisoners with an elevated risk for suicide should never be placed in solitary confinement.[15] An American Journal of Public Health study confirmed the real and serious danger of self-harm, finding that prisoners in solitary confinement are seven times more likely to harm themselves than those housed in general population.[16]

53.    Mr. Pearson experienced many of these psychological conditions, including depression, anxiety, suicidal ideations and self-harm while in solitary confinement. Mr. Pearson reported feelings of depression, anxiety and hopelessness during counseling sessions, but no action was taken to treat or even make a record of the conditions that Mr. Pearson reported.

54.    While at Upstate, Mr. Pearson attempted suicide by cutting his wrists in June 2011 and was sent to Clinton OMH for observation. The injuries on Mr. Pearson's wrists from his 2011 suicide attempt were serious enough that in May 2014, a mental health evaluation of Mr. Pearson noted visible scars on his arms as a result of the prior suicide attempt. Mr. Pearson's

---

[14] *See Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006)).
[15] *See* American Psychiatric Association, APA Position Statement on Segregation of Prisoners with Mental Illness (2012).
[16] *See* Kaba Fatos, et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates,* 104 Am. J. Pub. Health 442 (2014).

mental health conditions ultimately went untreated; after brief observation at Clinton OMH, Mr. Pearson was returned to Mid-State, still having feelings of depression, anxiety, and despair.

55.    Shortly after returning to Upstate, and while in a particularly vulnerable mental state, Mr. Pearson was sexually and physically abused by three or four prison officers on June 23, 2011 (they covered his face so he does not know the identity of the officers or exactly how many attacked him). Mr. Pearson has heard reports of numerous other inmates being similarly attacked after seeking treatment at OMH.

56.    Mr. Pearson reported the attack to OMH, which commenced an investigation, including a medical evaluation of the results of the attack. However, on information and belief, no officer was held responsible or punished for the attack.

57.    As a result of the attack, Mr. Pearson was fearful to return to OMH and to report his depression, anxiety, or suicidal ideations. He regularly woke up with suicidal thoughts, but decided not to report them to mental health staff or otherwise act on the thoughts out of fear that he would be sent back to OMH and suffer another attack by officers.

58.    Mr. Pearson continued to live in solitary confinement for nearly a decade despite his documented suicide attempt and abuse at the hands of prison officers. He continues to suffer today from severe mental anguish resulting from the years he spent without normal human interaction in stark and restrictive conditions, without any hope of release or relief from the physical and sexual abuse he faced at the hands of prison officers.

### Lack of Meaningful Review in Administrative Segregation and the Step-Down Program

59.    In accordance with 7 N.Y.C.R.R. § 301.4, DOCCS was required to conduct a review of Mr. Pearson's Ad Seg status every thirty days. Section 301.4 requires the committee to review the prisoner's institutional record and write a report setting forth: "(i) reasons why the

inmate was initially determined to be appropriate for administrative segregation; (ii) information on the inmate's subsequent behavior and attitude; and (iii) any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation."

60.    Although DOCCS purported to conduct official Ad Seg reviews, Mr. Pearson never received any meaningful review of his Ad Seg status.

61.    Instead, the reviews contained substantially similar language to prior reviews and used formulaic, boilerplate language that did not consider any changed circumstances since the previous review.

62.    For example, from December 2006 to March 2011, Mr. Pearson's reviews consisted of the same recitation of Mr. Pearson's criminal history, details about his upbringing and the January 2006 Incident, and a blanket statement that he should stay in Ad Seg because he has a "total disregard for authority" without any explanation or examples.

63.    Mr. Pearson's Ad Seg status did not change even during periods of time when his positive behavior was acknowledged by DOCCS.

64.    For example, in his July 26, 2006 review, despite commenting that "Pearson appears to have adjusted well to incarceration," and that "security staff states that he is quiet and cooperative," Mr. Pearson's guidance counselor recommended that he stay in Ad Seg because "Pearson's perceived positive adjustment is merely a façade to gain the confidence of others in an attempt to assault them or to possibly escape custody." The report provided no support for the notion that Pearson's positive adjustment was a "façade" or that he otherwise posed a risk of violence or escape. Indeed, no report ever claimed any conduct by Mr. Pearson after the January 2006 Incident supported the continued imposition of solitary confinement against Mr. Pearson.

In fact, Mr. Pearson only received two minor disciplinary tickets during the 13 years in solitary confinement after his initial Ad Seg placement.

65.    Mr. Pearson's reviews make note of his good behavior while in Ad Seg. In his March 7, 2008 review, the review committee, which included, on information and belief, Defendants John and Jane Does 1-15, acknowledged that "Pearson appears to be adjusting well to SHU" and that he "keeps to himself and is not a problem."  However, the review also states that "[a]lthough there is [sic] no misbehavior reports on inmate Pearson since 8/06 this can be due to his limited access to other individuals."

66.    The review committee's perfunctory approach to reviewing Mr. Pearson's status is especially apparent in its practice of copying comments verbatim from the previous review for years at a time. For example, in his January 2, 2009 review at Upstate Correctional Facility, the committee wrote a nearly identical comment that had appeared in each of Mr. Pearson's reviews since March 7, 2008: "Inmate Pearson appears to be adjusting well to SHU. Security states that inmate Pearson keeps to himself and is not a problem. Although there is [sic] no misbehavior reports on inmate Pearson since 8/06 this can be due to his limited access to other individuals because he is single celled."  The only changes made from the March 7, 2008 review were grammatical corrections; the content of Mr. Pearson's reviews stayed the same for almost a year, and then were copied verbatim with only very minor additions until May 2011. The committee also copied, verbatim, the unsupported reason for Mr. Pearson's continued placement in Ad Seg: "Taking into consideration inmate Pearson's past criminal history and his disciplinary history while incarcerated we cannot minimize the nature of his instant offense. It is strongly recommended that inmate Pearson remains in administrative segregation."

67.     On information and belief, the reviews that Mr. Pearson received throughout his entire time in Ad Seg were equally meaningless and perfunctory. Mr. Pearson never received meaningful review of his Ad Seg status up until the point he was transferred into the step-down program in April 2018.

68.     Contrary to the 30-day review requirement, Mr. Pearson received reviews on an inconsistent basis and received no reviews for significant periods of time. Mr. Pearson received no reviews at all during his time in the step-down program from April 2018 to June 2019, even though the step-down program subjected him to conditions identical to those in Ad Seg. While the review committee at least attempted to give the impression of reviewing Mr. Pearson's placement in Ad Seg through April 2018, they made no such attempt for the 14 months that Mr. Pearson was in solitary confinement in the step-down program under nearly identical conditions. As such, Mr. Pearson spent over a year in solitary confinement without any review at all.

69.     Based on the recycled language in the reviews he did receive while in Ad Seg, much of which reflected positively on Mr. Pearson, and the fact that each review simply repeated summarily the recommendation that he remain in Ad Seg, it appears that there was nothing Mr. Pearson could have done to be released from Ad Seg during his time there.

70.     Mr. Pearson never received meaningful reviews of his Ad Seg status and never received any reviews at all while in the step-down program. As a result he was in solitary confinement for 13 years.

71.     According to DOCCS regulations, the DOCCS Superintendents have the responsibility to conduct an independent review of the SMHC's recommendation to continue an

inmate's confinement in Ad Seg.[17] Upon information and belief, however, Superintendents regularly rubber-stamped SHMC determinations without completing an independent analysis.

72.    Upon information and belief, the Superintendent Defendants were required to meet regularly with the DRC and SHMC Defendants to review reports and records of Mr. Pearson's case that described his condition and deterioration.

73.    Upon information and belief, the Superintendents consistently failed to review the relevant materials about Mr. Pearson before confirming the recommendations of the SHMC.

74.    Upon information and belief, each of the DOCCS Deputy Commissioners and DOCCS Superintendents were involved in at least one decision since September 2017 to continue the confinement of Mr. Pearson in Ad Seg or in the step down program. Each of Mr. Pearson's reviews require the signature of, and were signed by, one of the DOCCS Superintendents or one of the DOCCS Deputy Commissioners. Upon information and belief, the DOCCS Superintendents and the DOCCS Deputy Commissioners involved in each of Mr. Pearson's Ad Seg reviews all failed to conduct an independent analysis of Mr. Pearson's circumstances. Instead, decisions of the disciplinary review boards were rubber-stamped, denying Mr. Pearson his right to meaningful review of his Ad Seg status.

75.    Upon information and belief, Defendants Eckert, Colvin and Thoms, as Superintendents, on at least one occasion since September 2017, reviewed, approved, and signed-off on the disciplinary review boards' continued decisions to keep Mr. Pearson confined in Ad Seg, in knowing disregard of the lack of justification for such confinement.

76.    Upon information and belief, Defendant Venettozzi, as SHU Director, on at least one occasion since September 2017, reviewed, approved, and signed-off on the disciplinary

---

[17] *See* 7 N.Y.C.R.R. § 301.4(d)(2).

review boards' continued decisions to keep Mr. Pearson confined in Ad Seg, in knowing disregard of the lack of justification for such confinement.

77.    Each of the DOCCS Commissioner Defendants were aware of the policies and practices in which the relevant disciplinary officers rubber-stamped Mr. Pearson's reviews and denied him of his right to a meaningful review of his Ad Seg status. However, the DOCCS Commissioner Defendants failed to remedy the policies and practices to require a meaningful review of Mr. Pearson's Ad Seg status.

**Defendants' Actions and Omissions Caused Violations of Mr. Pearson's Constitutional Rights**

78.    Each of the Defendants had the authority and indeed were required to conduct meaningful reviews of Mr. Pearson's Ad Seg status and each of the Defendants had the authority to take steps to end Mr. Pearson's time in solitary confinement.

79.    The DOCCS Commissioner Defendants Annucci, Morley, O'Gorman, Koenigsman and Bellnier each had policy-making and supervisory authority within DOCCS and were personally involved in authorizing and maintaining the unconstitutional policies and customs that lead Mr. Pearson to spend more than 13 years in solitary confinement without meaningful or timely review. Through their policy-making and supervisory authority, each of Defendants Annucci, Morley, O'Gorman, Koenigsman and Bellnier could have ended Mr. Pearson's time in unconstitutional solitary confinement but did not.

80.    The DOCCS Superintendent Defendants, Eckert, Colvin and Thoms, each had policy-making and supervisory authority with regard to SHU and the DOCCS disciplinary process, including reviewing, affirming, modifying, or reversing dispositions imposed at Tier III Hearings. The DOCCS Superintendent Defendants were responsible for the care, custody, and safety of all prisoners under their immediate jurisdiction. Each DOCCS Superintendent managed

or manages a DOCCS facility where Mr. Pearson was housed in the SHU and had policy-making and supervisory authority with regard to all operations at their respective facilities. The DOCCS Superintendents also review disciplinary hearings that impose punishments to solitary confinement. The DOCCS Superintendents were personally involved in the decision to confine inmates to Ad Seg and SHU, including Mr. Pearson. Through their policy-making authority, supervisory authority, and Ad Seg review responsibilities, each of Defendants Eckert, Colvin, and Thoms could have ended Mr. Pearson's time in unconstitutional solitary confinement but did not.

81.    The DOCCS SHU Defendant, Defendant Venettozzi, had policy-making and supervisory authority with regard to SHU and the DOCCS disciplinary process. Mr. Venettozzi's authority includes reviewing, affirming, modifying, or reversing dispositions imposed at Tier III Hearings.

82.    On information and belief, JOHN or JANE DOES 1-15, as members of the DOCCS SHMC, were part of the review committee that made the determination to keep Mr. Pearson confined in Ad Seg despite the lack of penological justification for his continued confinement in solitary confinement. Through their policy-making authority, supervisory authority, and Ad Seg review responsibilities, each of Defendants Venettozzi and John and Jane Does 1-15 could have ended Mr. Pearson's time in unconstitutional solitary confinement but did not.

83.    Each of the Commissioner Defendants, Superintendent Defendants, SHU Defendant and SHMC Defendants were explicitly made aware, through Mr. Pearson's administrative grievances, written complaints, attempted suicide, and abuse at the hands of

prison guards, that Mr. Pearson was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement.

84.    As a result of the aforementioned litigation against certain of the Defendants regarding the unconstitutionality of Ad Seg conditions, in addition to news articles and reports publicizing the inhumane conditions of solitary confinement,[18] each of the Defendants knew that being confined in solitary confinement would deprive Mr. Pearson of basic life necessities, basic human dignity, and the right to be free from cruel and unusual punishment. Each of the Defendants could have taken actions to remove Mr. Pearson from these patently unconstitutional conditions, yet did not.

85.    Instead, and in the face of reports about his positive behavior, each of the Commissioner Defendants, Superintendent Defendants, SHU Defendant and SHMC Defendants failed to provide Mr. Pearson with meaningful reviews of his Ad Seg status and failed to transfer him from Ad Seg to the general prison population for more than a decade.

86.    These failures by each of the Defendants deprived Mr. Pearson of his constitutional rights to be free from cruel and unusual punishment and to receive due process in the form of meaningful and timely periodic reviews of his detention in Ad Seg and to be free from grossly disproportionate sentences.

87.    As a direct result of each of the Defendants' actions, Mr. Pearson has suffered and continues to suffer severe mental anguish.

### Mr. Pearson Has Exhausted All Administrative Remedies

88.    In April 2006, Mr. Pearson appealed the decision placing him in Ad Seg. The appeal was submitted to the DOCCS Commissioner at the time, Glenn Goord, whose office

---

[18] *See supra* note 5.

forwarded it to the Director of Special Housing/Inmate Discipline, who ultimately denied the appeal.

89.     On March 15, 2017, Mr. Pearson submitted a grievance challenging his continuous and ongoing Ad Seg status through DOCCS's Inmate Grievance Program. He noted specifically that his Ad Seg reviews had not taken place, and when they had taken place, they were not timely and contained falsehoods. He did not receive a response or even a grievance number, so he requested that the grievance be forwarded to the Inmate Grievance Review Committee ("IGRC") on April 3, 2017. After sending reminders to the IGRC on April 23, April 25, and May 1, 2017 and receiving no response, Mr. Pearson requested on May 24, 2017 that the grievance be forwarded to the superintendent of Five Points, where he was imprisoned at the time. The superintendent never responded, so Mr. Pearson appealed to the Central Office Review Committee ("CORC") on June 27, 2017. The CORC replied on July 20, 2017, stating that the grievance had been denied because Mr. Pearson could not directly appeal to the CORC. Mr. Pearson then sent letters about his grievances to the Five Points superintendent and the IGRC on August 1, 2017. Mr. Pearson never received a response to these letters.

90.     On January 8, 2018, while in custody at Five Points, Mr. Pearson submitted an additional grievance reiterating the reasons for his original March 2017 grievance.

### Our Evolving Standards of Decency Demand Significant Limits on the Use of Prolonged Solitary Confinement

91.     Recognizing the severe and often irreversible harm caused by solitary confinement, a wide range of highly regarded professional groups and international organizations have publicly announced their commitment to sharply limiting or abolishing solitary confinement. Medical health professional associations, legal organizations, prisoner re-entry

organizations, correctional organizations, religious organizations, and international human rights bodies echo scientific research admonishing the use of solitary confinement.

92.    The nation's most highly regarded medical health professional organizations have condemned the use of solitary confinement, particularly its use on adolescents and those with mental illness.

93.    The American Psychiatric Association has stated that, with "rare exception," prisoners with mental illnesses should never be subjected to prolonged isolation, due to the real and serious potential for harm.[19] The American Academy of Child and Adolescent Psychiatry similarly recognized "the potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety, and psychosis."[20]

94.    Notably, the National Commission on Correctional Health Care ("NCCHC") has declared that solitary confinement for longer than fifteen consecutive days is "cruel, inhumane and degrading treatment, and harmful to an individual's health," and advises that "[h]ealth care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided."[21] In its Position Statement on Solitary Confinement, the NCCHC reports that "[t]hose in solitary confinement

---

[19] *See* American Psychiatric Association, *APA Position Statement on Segregation of Prisoners with Mental Illness* (2012), available at https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Psychiatric-Services-in-Adult-Correctional-Facilities.pdf.

[20] *See* Solitary Confinement of Juvenile Offenders (Approved by Council, Apr. 2012), available at https://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y, 325, 325-83 (2006)).

[21] National Commission on Correctional Healthcare, *Solitary Confinement (Isolation)* (2016), available at https://www.ncchc.org/solitary-confinement.

27

often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs."[22]

95.     Professional legal organizations recommend serious restrictions on the use of solitary confinement. The New York State Bar Association has stated that "solitary confinement, if used at all, should be measured in *days*, not years, months, or even weeks."[23] The American Bar Association has stated that only the most severe disciplinary offenses, in which safety and security are seriously threatened, ordinarily warrant a sanction that exceeds thirty days' placement in disciplinary housing.[24]

96.     International human rights bodies have condemned the use of solitary confinement and issued direct pleas to the United States to halt its continued use of the practice. The United Nations Special Rapporteur on Torture has concluded that fifteen days in solitary confinement is considered cruel, inhuman, or degrading treatment or punishment—in other words, torture.[25] The United Nations Committee Against Torture has expressed great concern over the frequent use of prolonged isolation and has recommended the United States "[l]imit the use of solitary confinement as a measure of last resort, for as short a time as possible[.]"[26]

---

[22] *Id.*

[23] *See* N.Y. State Bar Ass'n Comm. On Civ. Rts. Report to the House of Delegates, *Solitary Confinement in New York* State, 1, 21 (Approved on Jan. 25, 2013) *available at* http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26699 (emphasis in original).

[24] American Bar Association, Standards on Treatment of Prisoners (2011), available at https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/Treatment_of_Prisoners.pdf.

[25] *See* Juan E. Mendez, Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 (Aug. 5, 2011) *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/N11/445/70/PDF/N1144570.pdf?OpenElement.

[26] *See* U.N. Comm. Against Torture, Concluding Observations on the Combined Third to Fifth Periodic Reports of United States of America (Dec. 19, 2014), available at https://digitallibrary.un.org/record/790513?ln=en#record-files-collapse-header.

97.     Religious leaders from diverse spiritual backgrounds are also united against the continued use of solitary confinement.[27]

98.     Nationwide, state and federal legislators have responded to the growing call to abolish the practice of solitary confinement. The Senate Judiciary Subcommittee on the Constitution, Human Rights, and Civil Rights has held a series of congressional hearings to investigate the widespread use of solitary confinement and the attending harms.[28]

99.     Former President Barack Obama criticized the nation's widespread use of long-term solitary confinement, especially with respect to juveniles and those with mental illness, in light of the overwhelming evidence of the severe and long-term effects of solitary confinement. In order to increase the likelihood of successful re-entry, he announced that he would be adopting the recommendations of the Department of Justice as applied to the federal prison system "banning the use of solitary confinement for juveniles and as a response to low-level

---

[27] *See, e.g.*, Francis X. Rocca, National Catholic Reporter, Pope Francis Calls for Abolishing Death Penalty and Life Imprisonment (Oct. 23, 2014) ), available at https://www.ncronline.org/blogs/francis-chronicles/pope-francis-calls-abolishing-death-penalty-and-life-imprisonment; 220th General Assembly of the Presbyterian Church (USA), Commissioner's Resolution on Prolonged Solitary Confinement in U.S. Prisons (2012), available at https://www.pc-biz.org/#/search/4389; The Rabbinical Assembly, Resolution on Prison Conditions and Prisoner Isolation (Passed by the Rabbinical Assembly Plenum May 2012), available at https://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation.
[28] *See* U.S. S. Judiciary Subcomm. on Const., Human Rights, & Civ. Rts., Hearing on "Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences" (June 19, 2012; Feb. 25, 2014), available at https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-the-human-rights-fiscal-and-public-safety-consequences and https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-ii-the-human-rights-fiscal-and-public-safety-consequences.

infractions, expanding treatment for the mentally ill and increasing the amount of time prisoners in solitary can spend outside of their cells."[29]

100.    DOCCS has already acknowledged the harms caused by solitary confinement and agreed to limit its use of the practice in some contexts and for some populations.

101.    In the *Peoples v. Fischer* settlement, DOCCS acknowledged the harm SHU causes and agreed to systemic changes including providing progressive behavioral incentives for prisoners in SHU, more beds in behavioral alternative units, and guidelines for Hearing Officers to consider when imposing SHU sanctions.[30]

102.    While a step in the right direction, the *Peoples* settlement is insufficient to remedy the severe harms endured by Mr. Pearson and numerous others because there continues to be no limit to the accumulation of continuous SHU time. The settlement also does not provide relief to prisoners like Mr. Pearson that are placed in solitary confinement under Ad Seg status.[31]

## LEGAL CLAIMS

### I.    FIRST CAUSE OF ACTION (ALL DEFENDANTS)
Violations of the Eighth Amendment for Imposing Cruel and Unusual
Punishments that Contravened Standards of Decency

103.    Mr. Pearson repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

104.    At all relevant times, each of the Defendants acted under color of state law.

---

[29] *See* President Barack Obama, Opinion, Barack Obama: Why We Must Rethink Solitary Confinement, Wash. Post, Jan. 25, 2016.
[30] *See* Order Granting the Parties' Joint Motion for Final Approval of Class-Action Settlement, *Peoples v. Fischer*, No. 11-cv-2694, (S.D.N.Y. Apr. 1, 2016), ECF No. 331.
[31] *Id*. at 28 ("Nothing in this section precludes the continued selective use of Protective Custody or Administrative Segregation in accordance with established procedures.").

105.    Mr. Pearson was at all times dependent on the Defendants to protect him from harm and to provide for his basic needs.

106.    The acts and omissions of the Defendants, which resulted in Mr. Pearson's continuous solitary confinement for over 10 years, contravene standards of decency against the use of long-term solitary confinement.

107.    By their use of the policies and practices described herein, the Defendants caused Mr. Pearson to suffer severe harm by knowingly disregarding the substantial risk that being confined in solitary confinement would deprive Mr. Pearson of life's necessities, basic human dignity, and right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

108.    The Defendants' actions have deprived Mr. Pearson of basic human needs, such as normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity. Extremely prolonged deprivation of these basic human needs has inflicted permanent psychological injury on Mr. Pearson.

109.    The risk of harm that Mr. Pearson faced by being placed in solitary confinement was so obvious that knowledge may be inferred under these circumstances. It was patently obvious to the Defendants, and to any reasonable person, that the conditions imposed on Mr. Pearson over many years would cause tremendous mental anguish, suffering, and pain.

110.    The Defendants' unconstitutional confinement of Mr. Pearson and indifference to Mr. Pearson's suffering constituted more than mere negligence because the Disciplinary Defendants were explicitly made aware, through administrative grievances, written complaints, Mr. Pearson's attempted suicide, and his abuse at the hands of prison guards, that Mr. Pearson was experiencing significant and lasting physical and psychological injury as a result of his

31

solitary confinement in Ad Seg. As such, these circumstances fully support the conclusion that the Defendants had knowledge of the risk of harm that Mr. Pearson faced in solitary confinement.

111.    The policies and practices complained of herein have been implemented by the Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacity.

112.    Each of the Defendants is sued in their individual and official capacities for declaratory relief and in their individual capacities for monetary damages, as they knowingly allowed the policies and customs that permitted these Eighth Amendment violations to continue under their supervision and authority.

## II.    SECOND CAUSE OF ACTION (ALL DEFENDANTS)
### Violations of the Eighth Amendment for Imposing
### Grossly Disproportionate Sentences to Solitary Confinement that
### Served no Legitimate Penological Purposes

113.    Mr. Pearson repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

114.    The Defendants' policy of indefinite and prolonged isolated confinement imposed disproportionate punishment on Mr. Pearson. The Defendants had no legitimate penological interest in retaining Mr. Pearson in the debilitating conditions of Ad Seg solitary confinement.

115.    By their acts and omissions, the Defendants subjected Mr. Pearson to solitary confinement, thereby inflicting significant psychological and physical harm over the course of thirteen years, despite Mr. Pearson not committing any serious infractions following his placement in Ad Seg. This confinement served no legitimate, penological purpose and was a grossly disproportionate punishment that violated Mr. Pearson's Eighth Amendment right to be free from cruel and unusual punishment.

116.    Each of the Defendants is sued in their individual and official capacities for declaratory relief and in their individual capacities for monetary relief, as they knowingly allowed the continuance of the policies and customs that permitted such violations of the Eighth Amendment to continue under their supervision and authority.

### III.    THIRD CAUSE OF ACTION (ALL DEFENDANTS)
Violations of the Fourteenth Amendment Right to
Procedural Due Process for Lack of Meaningful Review

117.    Mr. Pearson repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

118.    The Defendants deprived Mr. Pearson of a protected liberty interest in avoiding long-term solitary confinement. The Defendants denied Mr. Pearson of both meaningful and timely periodic review of his detention in Ad Seg, in violation of the Fourteenth Amendment.

119.    Because indefinite placement in Ad Seg constituted a significant and uncommon hardship, Mr. Pearson was entitled to meaningful notice of whatever change in behavior was required to rejoin the general prison population or be placed in other less restrictive housing, as well as meaningful and timely periodic reviews to determine whether his behavior warranted detention in Ad Seg.

120.    The Defendants denied Mr. Pearson any such notice or meaningful review by: (1) failing to provide Mr. Pearson with notice of what to do to get released from Ad Seg; (2) providing misleading notice that he could become eligible for release from Ad Seg by maintaining "positive" behavior for a significant period, when in fact Mr. Pearson had maintained positive behavior and was still housed in Ad Seg; (3) making a predetermination that Mr. Pearson was to stay in Ad Seg, thus rendering the periodic reviews procedurally meaningless; (4) failing to consider Mr. Pearson's changes in behavior over time and whether he

remained a security risk to justify his continuous confinement in Ad Seg; and (5) failing to conduct timely reviews and provide him with those reviews, thus precluding him from responding, participating, or providing additional information and precluding the review committee themselves from conducting meaningful review.

121.    Each of the Defendants' actions were in violation of Mr. Pearson's due process rights under the Fourteenth Amendment of the United States Constitution.

122.    Each of the Defendants is sued in their individual and official capacities for declaratory relief, as each Defendant knowingly permitted policies and customs to continue that violated the Fourteenth Amendment right to due process. The Defendants are also sued in their individual capacities for monetary relief for depriving Mr. Pearson of his due process right to meaningful review.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff KAYSON PEARSON respectfully asks that this Court:

1.    Declare that the Defendants' acts and omissions violated Mr. Pearson's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution;

2.    Enter judgment in favor of Mr. Pearson for reasonable actual and compensatory, including consequential, damages against each of the Defendants, jointly and severally, to compensate Mr. Pearson for his pain, suffering, and other hardships arising from the Defendants' deliberate indifference to his medical needs and due process violations;

3.    Enter judgment for Mr. Pearson for reasonable punitive damages against each of the Defendants;

4.      Award Mr. Pearson the costs of this action, including reasonable attorneys' fees;

        and

5.      Grant such other and further relief as this Court deems just and proper.


Respectfully submitted,


Dated: February 11, 2021                    By: /s/ James D. Arden
New York, New York                          James D. Arden
                                            Zachary Payne
                                            Melissa Verne (*application for admission
                                            forthcoming*)
                                            Michael McGuinness (*application for
                                            admission forthcoming*)
                                            SIDLEY AUSTIN LLP
                                            787 Seventh Ave New York, NY 10019
                                            Telephone: (212) 839-5889
                                            jarden@sidley.com
                                            zpayne@sidley.com
                                            mverne@sidley.com
                                            mmcguinness@sidley.com