**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**KAYSON PEARSON,**

                                        **Plaintiff,**

       **v.**                                                                    **9:20-cv-01175**

**ANTHONY J. ANNUCCI, Acting**
**Commissioner, Department of Corrections**
**and Community Supervision; DR. JOHN**
**MORLEY, DOCCS Deputy Commissioner &**
**Chief Medical Officer; JAMES O'GORMAN,**
**Deputy Commissioner for Correctional**
**Facilities; DR. CARL KOENIGSMANN,**
**former DOCCS Deputy Commissioner &**
**Chief Medical Officer; JOSEPH BELLNIER,**
**former DOCCS Deputy Commissioner for**
**Correctional Facilities; JOHN COLVIN,**
**Superintendent of Five Points; MATTHEW**
**THOMS, Superintendent of Mid-State;**
**STEWART T. ECKERT, Superintendent of**
**Wende; DONALD VENETTOZZI, Director**
**of DOCCS Special Housing and Inmate**
**Disciplinary Program; JOHN or JANE DOES**
**1–5, members of the DOCCS SHMC at Five**
**Points; JOHN or JANE DOES 6-10, members**
**of the DOCCS SHMC at Mid-State; and**
**JOHN or JANE DOES 11-15, members of the**
**DOCCS SHMC at Wende,**

                                        **Defendants.[1]**

_____

_____

[1] While Plaintiff's original complaint asserted claims against Defendant Albert Prack, _see_ Dkt. 1, the First Amended Complaint does not name  Prack as a Defendant. _See_ Dkt. 23. The parties' briefs likewise do not mention Defendant Prack or include him in the case caption. _See_ Dkts. 42--1, 45, 46. Accordingly, the Court deems Plaintiff's claims against Defendant Prack to be waived. _See Elliot v. City of Hartford_, 649 F. App'x 31, 32 (2d Cir. 2016) (summary order) (noting that it is "generally the case that '[a]ll causes of action alleged in an original complaint which are not alleged in an amended complaint are waived'") (quoting _Austin v. Ford Models, Inc._, 149 F.3d 148, 155 (2d Cir. 1998), _abrogated on other grounds by Swierkiewicz v. Sorema N.A._, 534 U.S. 506 (2002)). The Clerk of the Court is respectfully directed to terminate Defendant Prack on the docket.

1

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION and ORDER**

I.    **INTRODUCTION**

Plaintiff Kayson Pearson commenced this action asserting that the defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. *See* First Amended Complaint ("FAC"), Dkt. 23.  He contends that while in the custody of the New York Department of Corrections and Community Supervision ("DOCCS") he was subjected to thirteen consecutive years in solitary confinement without appropriate periodic reviews. *Id*.  Pearson uses the term "solitary confinement" to refer to his confinement in the Special Housing Unit ("SHU") under administrative segregation ("Ad Seg") status as well as his time in the step-down program[2] because, he contends, the conditions of Ad Seg and the step-down program were virtually identical for him. *See* FAC ¶¶ 46-49.  The FAC claims that all Defendants and all John/Jane Does (1) violated the Eighth Amendment by imposing cruel and unusual punishment, (2) violated the Eighth Amendment by "imposing grossly disproportionate sentences to solitary confinement that served no penological purpose," and (3) violated the Fourteenth Amendment right to procedural due process by failing to provide meaningful review. *Id.* at pp. 30–34. The action is brought

---

[2] Plaintiff alleges that "[t]he step-down program is supposed to provide a phased transition for individuals in Ad Seg to return to general population. However, despite its name and ostensible purpose, in practice the conditions of the step-down program were identical to Ad Seg." FAC ¶ 47.

pursuant to 42 U.S.C. § 1983 and seeks declaratory relief, as well as compensatory and punitive damages from all defendants.  *See generally id.*

Defendants Anthony Annucci, John Morley, James O'Gorman, Carl Koenigsmann, Joseph Bellnier, John Colvin, Matthew Thoms, Stewart Eckert, and Donald Venettozzi ("Defendants") previously moved pursuant Federal Rule of Civil Procedure 12(b)(6) to dismiss the action against them.  Dkt. 26.  Defendants argued that Plaintiff's claims pertaining to events that took place prior to September 25, 2017 are barred by the applicable statute of limitation, and that the FAC fails to allege facts plausibly demonstrating each defendant's personal involvement in the alleged constitutional violations.  The Court denied the motion as it pertained to the statute of limitations. *See* 03/21/22 Dec. & Ord. ("Order"), Dkt. 41, at 3-5.  The Court denied the motion with leave to renew as it pertained to personal involvement because neither side had addressed their arguments under *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), which held that a plaintiff must establish that a supervisory defendant directly violated a plaintiff's constitutional rights. *See id.* at 6-8; *Trangreti*, 983 F.3d at 618.

Defendants now move (1) to dismiss the FAC in its entirety against Defendants Annucci, Morley, O'Gorman, Koenigsmann, Bellnier, and Venettozzi, and the two Eighth Amendment claims against Defendants Colvin, Eckert, and Thoms; (2) for reconsideration of that portion of the Order denying Defendants' motion to dismiss on statute of limitations grounds on all causes of action against Defendant Bellnier, and on the Second Cause of Action against all Defendants, and (3) to sever the claims against Defendants Colvin and Eckert and transfer them—along with the claims against John/Jane Does 1–5 and 11–15—

3

to the United States District Court for the Western District of New York. Dkt. 42.

Defendants maintain that the Court should permit only the Fourteenth Amendment claim to

proceed and only as to Defendants Colvin, Thoms, and Eckert. Dkt. 42-1, at 2.  Plaintiff

opposes the motion, Dkt. 45, and Defendants file a reply.  Dkt. 46.

## II.    STANDARDS OF REVIEW

### Motion to Dismiss

To survive a motion to dismiss, "'a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Lynch v. City of

New York*, 952 F.3d 67, 74 (2d Cir. 2020)(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129

S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ("*Iqbal*"), in turn quoting *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ("*Twombly*")).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Although a complaint need not

contain detailed factual allegations, it may not rest on mere labels, conclusions, or a

formulaic recitation of the elements of the cause of action, and the factual allegations 'must

be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City Of

New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5

(S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). Determining whether a

complaint states a plausible claim for relief requires a Court to draw on its judicial

experience and common sense, "[b]ut where the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.

In considering a motion to dismiss, "the court is to accept as true all facts alleged in the complaint ... [and] draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss because such statements are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Likewise, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### Motion for Reconsideration

When a party files a motion for reconsideration, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked–matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995). Reconsideration should be granted when the moving party shows "'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 790). However, such a motion is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking 'a second bite at the

apple[.]'" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 41 (2d Cir. 2012)

(quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).

> A motion for reconsideration is not "an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced." *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005). It is not a way to "advance new facts, issues or arguments not previously presented to the Court." *Polsby v. St. Martin's Press, Inc.*, No. 97 Civ. 960 (MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) (internal citation omitted). "Where the movant fails to show that any controlling authority or facts have actually been overlooked, and merely offers substantially the same arguments he offered on the original motion or attempts to advance new facts, the motion for reconsideration must be denied." [*Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500 (S.D.N.Y. 2008)] (citing *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).

> The "moving party bears the burden of proof." *Freedom, N.Y., Inc. v. United States*, 438 F. Supp. 2d 457, 462 (S.D.N.Y. 2006). The decision to grant or deny a motion for reconsideration is "within 'the sound discretion of the district court.'" *Premium Sports Inc. v. Connell*, No. 10 Civ. 3753 (KBF), 2012 WL 2878085, at *1 (S.D.N.Y. July 11, 2012) (quoting *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009)).

*B.C. v. New York City Dep't of Educ.*, No. 21-CV-2840 (ER), 2023 WL 2301424, at *2

(S.D.N.Y. Mar. 1, 2023).

### Motion to Transfer Venue

A district court may exercise its discretion to transfer venue "[f]or the convenience of

parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Among the factors to

be considered in determining whether to grant a motion to transfer venue are

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006) (internal quotation marks and alteration omitted). "'The Second Circuit has consistently held that a plaintiff's choice of forum is presumptively entitled to substantial deference.'" *Ward v. Stewart*, 133 F. Supp. 3d 455, 461 (N.D.N.Y. 2015) (quoting *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 698 (S.D.N.Y. 2009)). "In deciding whether to disturb a plaintiff's choice of forum, the convenience of the witnesses is generally the most important factor in the transfer analysis." *Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246, 252 (E.D.N.Y.2010). "'Parties seeking consideration of this factor must specify the identity of key witnesses and the nature of their likely testimony, and support these statements with affidavits.'" *Ward*, 133 F. Supp. 3d at 461 (quoting *Wilson v. DirectBuy, Inc.*, 821 F.Supp.2d 510, 517 (D. Conn. 2011)). The party requesting transfer carries the "burden of making out a strong case for transfer." *Filmline (Cross–Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521 (2d Cir. 1989) (internal quotation marks omitted).

## III.    BACKGROUND

Plaintiff has been an inmate in DOCCS custody since 2004, when he was convicted of kidnapping, rape, murder, and sodomy. *See, generally* FAC.  He has been confined to several correctional facilities throughout New York State during his incarceration and, as of the date of the FAC, remained in DOCCS custody. *Id.* ¶13.  As relevant to the FAC, Plaintiff was incarcerated in the Western District of New York at Five Points Correctional Facility ("Five Points") from May 2016 to January 11, 2018; in the Western District of New York at Wende Correctional Facility ("Wende") from January 11, 2018 to April 17, 2018; in this District at Mid-

State Correctional Facility from April 17, 2018 to June 2019; and returned to Wende in the Western District in June 2019, where he remains as of the date of this motion. FAC ¶13.

Plaintiff entered Administrative Segregation ("Ad Seg") on April 14, 2006 because, before he was sentenced, he stabbed his attorney in an effort to escape custody, and he remained in Ad Seg until April 12, 2018. FAC ¶ 34. The 2006 attack was the only incident causing Plaintiff to enter Ad Seg. *Id.* ¶ 4.  In April 2018, Plaintiff entered a step-down program until he was released into general population at Wende in June 2019. *Id.* In the interim, all Defendants "were explicitly made aware, through [Plaintiff]'s administrative grievances,[3] written complaints, attempted suicide, and abuse at the hands of prison guards, that [Plaintiff] was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement." *Id.* at 83.

While in Ad Seq, Plaintiff was housed in a single-occupancy, 8-foot by 14-foot concrete cell for at least 22 hours per day. The cell was dirty, with dirty water sometimes coming out of the sink. A bright light was kept on at all hours of the day, remaining on even after Plaintiff complained to prison officers. FAC ¶ 40.  He was allowed to shower three times a week, although the showers were often without hot water. His cell became cold starting in September each year, but officers told him that the heat could not be turned on until mid-October, so he was cold for weeks at a time every year in his cell. *Id.* ¶ 41. From 2006 to 2012, Plaintiff was allowed only one hour of outdoor recreation each day. From 2012 until his release into general population, Plaintiff was allowed two hours of recreation

---

[3] The FAC mentions only two grievances. The first was filed on March 15, 2017; and allegedly sent to the Superintendent of Five Points on May 24, 2017. FAC ¶89. The second grievance—submitted on January 8, 2018—rehashed the content of the first. *Id.* ¶90.

each day. Outdoor recreation took place in a 6-foot by 8-foot empty pen which was enclosed on three sides by solid walls and with one side of mesh fencing. The recreation pen had no equipment or structure to facilitate exercise. Plaintiff did not have access to group recreation nor the opportunity to interact with other people, even during these brief periods of recreation. Further, Plaintiff's allotted one or two hours of outdoor recreation were often inaccessible due to the cold temperatures in northern New York. *Id.* ¶ 42.

While in Ad Seg, Plaintiff was denied access to opportunities for group meals, group education, or group prayer. He received all his meals through a slot in his door and ate alone in his cell. In addition, Plaintiff was not permitted to attend therapeutic groups or programs for his mental health and behavioral needs. While in the step-down program, Plaintiff was allowed one hour per day, Monday through Friday, of group education. Plaintiff is Jewish, yet for 13 years he was denied the ability to go to synagogue or to light Shabbat candles in his cell. *Id.* ¶ 43.

Plaintiff had minimal human interaction in Ad Seg and in the step-down program. Typically, his only daily human interaction was with correctional officers or medical staff for a few minutes at a time. These interactions took place through a small open slot in his cell; no one came inside Plaintiff's cell. A counselor made rounds every day, but if Plaintiff wanted to interact with her, he had to yell out from his cell. For the first nine years of his time in Ad Seg, Plaintiff was permitted one 30-minute phone call per month. This was later expanded to a single 30-minute phone call per week. Plaintiff was allowed to see visitors – without contact – once a week. *Id.* ¶ 44. Plaintiff was not permitted to interact with other prisoners and could not see any of the other prisoners. The only way Plaintiff could interact

with the other prisoners was to yell from his cell. However, Plaintiff does not like to yell and would face disciplinary sanctions for yelling, so he did not have a chance to talk to anyone at all. Despite this risk, many prisoners in the SHU yell to communicate with one another. The constant yelling by the other prisoners prevented Plaintiff from having any prolonged periods without disturbance. *Id.* ¶ 45.

Plaintiff was placed into a step-down program on April 12, 2018. He remained in this program until he was released into general population in June 2019. *Id.* ¶ 46. He asserts that the conditions of the step-down program were identical to Ad Seg. *Id.* ¶ 47. In the step-down program, Plaintiff was confined to his cell for 21 hours a day. He could not speak to or interact with other inmates. He still received only one visit per week, without contact, and was allocated the same privileges regarding personal property and commissary purchases. His recreation time was still spent alone in a small, concrete block. The only minor difference between Ad Seg and the step-down program was that Plaintiff received an additional four hours of inmate programming sessions each week. Plaintiff was still chained during the sessions, and he received no additional programming on the weekends, which were spent in complete isolation as in Ad Seg. In addition, the programming consisted mostly of anger management sessions that were tailored to inmates who were frequently being shuffled between general population and a SHU for disciplinary infractions, and Plaintiff found the additional programming to be meaningless for an inmate who had been in Ad Seg for over a decade. Moreover, Plaintiff did not receive a single review of his confinement status during his time in the step-down program. *Id.* ¶ 48.

10

While in solitary confinement, Plaintiff experienced depression, anxiety, suicidal ideations and self-harm. Plaintiff reported feelings of depression, anxiety and hopelessness during counseling sessions, but no action was taken to treat or even make a record of the conditions that Plaintiff reported. *Id.* ¶ 53.  While at Upstate, Plaintiff attempted suicide by cutting his wrists in June 2011 and was sent to the Office of Mental Health Satellite Unit of the New York Psychiatric Center ("OMH") at Clinton Correctional Facility for observation. The injuries on Plaintiff's wrists from his 2011 suicide attempt were serious enough that in May 2014, a mental health evaluation of Plaintiff noted visible scars on his arms as a result of the prior suicide attempt. Plaintiff's mental health conditions ultimately went untreated; after brief observation at Clinton OMH, Plaintiff was returned to Mid-State, still having feelings of depression, anxiety, and despair. *Id.* ¶ 54. Shortly after returning to Upstate, Plaintiff was sexually and physically abused by three or four prison officers on June 23, 2011 (they covered his face so he does not know the identity of the officers or exactly how many attacked him).  *Id.* ¶ 55.  Plaintiff reported the attack to OMH, which commenced an investigation, including a medical evaluation of the results of the attack. However, on information and belief, no officer was held responsible or punished for the attack. *Id.* ¶ 56.  As a result of the attack, Plaintiff was fearful to return to OMH and to report his depression, anxiety, or suicidal ideations. He regularly woke up with suicidal thoughts, but decided not to report them to mental health staff or otherwise act on the thoughts out of fear that he would be sent back to OMH and suffer another attack by officers. *Id.* ¶ 57.

11

New York regulations required DOCCS to periodically conduct reviews of Plaintiff's status on Ad Seg. *Id.* ¶ 59 (alleging that DOCCS was required to review his status every 30 days); *see also* 7 N.Y.C.R.R. § 301.4(d)("An inmate in administrative segregation status shall have such status reviewed every sixty days in accordance with the following procedure").[4] However, "the reviews that [Plaintiff] received throughout his entire time in Ad Seg were equally meaningless and perfunctory," and he "never received meaningful review of his Ad Seg status up until the point he was transferred into the step-down program in April 2018." Dkt. 23 ¶ 67.  Plaintiff contends that the reviews conducted by DOCCS "contained substantially similar language to prior reviews and used formulaic, boilerplate language that did not consider any changed circumstances since the previous review." *Id.* ¶ 61; *see id.* ¶¶ 62-66.  Plaintiff was not released from Ad Seg even when the reviews acknowledged his positive behavior. *Id.* ¶¶ 64-66, 69.  Plaintiff received reviews on an inconsistent basis and received no reviews for significant periods of time, and received no reviews at all during his time in the step-down program from April 2018 to June 2019, "even though the step-down program subjected him to conditions identical to those in Ad Seg." *Id.* ¶ 68.

As discussed more fully below, Plaintiff alleges that some defendants, although having the authority to end his solitary confinement, failed to do so. Further, he alleges that

---

[4] Section 301.4 was amended effective December 16, 2020. In this decision, the Court cites to the version of Section 301.4 that was in effect at the time Plaintiff was confined in Ad Seg and the step-down program.

some defendants who were required to review his solitary confinement status merely
"rubber stamped" the reviews by others and did not conduct their own analysis even
though required to do so.

## IV.    DISCUSSION

### Motion to Dismiss

Defendants argue that the Court should dismiss the FAC in its entirety as to
Defendents Annucci, Morley, O'Gorman, Koenigsmann, Bellnier, and Venettozzi because
Plaintiff fails to allege sufficient facts tending to show their personal involvement in any alleged
constitutional violation.  Defendants maintain that the Court should permit only the Fourteenth
Amendment claim to proceed and only as to Defendants Colvin, Thoms, and Eckert.

To establish a defendant's individual liability in a suit brought under Section 1983, a
plaintiff must show "the defendant's personal involvement in the alleged constitutional
deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations
omitted). A plaintiff must "allege a tangible connection between the acts of a defendant
and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  In *Tangreti*,
the Second Circuit held that "there is no special rule for supervisory liability" and that "a
plaintiff must plead and prove 'that each Government-official defendant, through the
official's own individual actions, has violated the Constitution.'" 983 F.3d at 618 (quoting
*Iqbal*, 556 U.S. at 676).  "Thus, the 'factors' necessary to plead and establish a Section
1983 violation will vary with the constitutional provision at issue' because the elements of
different constitutional violations vary.'" *Williams v. Annucci*, No. 9:20-cv-1417 (BKS/TWD),

13

2021 U.S. Dist. LEXIS 196917, at *12-13 (N.D.N.Y. Oct. 13, 2021)(quoting *Tangreti*, 983 F.3d at 618, in turn quoting *Iqbal*, 556 U.S. at 676).

"To state a claim under the Eighth Amendment that a defendant failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with deliberate indifference." *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see Hendrix v. Annucci*, No. 9:20-CV-0743 (GTS/TWD), 2021 U.S. Dist. LEXIS 183934, at *21 (N.D.N.Y. Sep. 27, 2021);[5] *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 377 (N.D.N.Y. 2020).[6] "Deliberate indifference under the Eighth Amendment standard means the official must 'know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Vega*, 963 F.3d at 273 (quoting *Farmer*, 511 U.S. at 837); *see Hendrix*, 2021 U.S. Dist. LEXIS 183934, at *21.[7] "In addition to satisfying

---

[5] ("In the context of an Eighth Amendment claim, to show that a defendant failed to prevent an inmate's harm, the plaintiff must allege two elements: (1) 'conditions of confinement that objectively pose an unreasonable risk of serious to their current or future health,' and (2) 'that the defendant acted with 'deliberate indifference.'")(quoting *Tangreti*, 983 F.3d at 618-19, in turn quoting *Vega*, 963 F.3d at 273)

[6] ("A plaintiff asserting an Eighth Amendment claim related to the conditions of his confinement must satisfy both objective and subjective tests: (1) to satisfy the objective test, a plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs such that the conditions pose an unreasonable risk of serious damage to his health; and (2) to satisfy the subjective test, a plaintiff must demonstrate that the defendants imposed the conditions with deliberate indifference, meaning that the defendants knew of, and disregarded, an excessive risk to the plaintiff's health or safety.")(cleaned up)

[7] ("In the same context, a government official acts with deliberate difference when they 'know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'") (quoting *Vega*, 963 F.3d at 273, in turn quoting *Farmer*, 511 U.S. at 837)

14

both requirements of the Eighth Amendment analysis, a plaintiff must show that each

defendant, through their own actions, violated plaintiff's Eighth Amendment rights and was

personally aware of and disregarded an excessive risk to plaintiff's health or safety."

*Hendrix,* 2021 U.S. Dist. LEXIS 183934, at *21-22 (citation omitted); *see Williams*, 2021

U.S. Dist. LEXIS 196917, at *13.[8]

To state a procedural due process claim under the Fourteenth Amendment, a

plaintiff must establish: "(1) that he possessed a liberty interest and (2) that the defendants

deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d

223, 225 (2d Cir. 2001).  "The Due Process Clause requires, among other things, that

prison officials periodically review whether an inmate who is confined in Ad Seg continues

to pose a threat to the facility in order to ensure that Ad Seg is not used a pretext to keep

the inmate in the SHU indefinitely." *H'Shaka*, 444 F. Supp. 3d at 372 (citing *Proctor v.*

*LeClaire*, 846 F.3d 597, 601 (2d Cir. 2017), in turn citing *Hewitt v. Helms*, 459 U.S. 460,

477 n.9, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). "The purpose of periodic reviews 'is to

ensure that the state's institutional interest justifying the deprivation of the confined

inmate's liberty has not grown stale and that prison officials are not using Ad Seg as a

pretext for indefinite confinement of an inmate.'" *Id.* (quoting *Proctor,* 846 F.3d at 609, in

turn quoting *Hewitt*, 459 U.S. at 476-77 & n.9, 103 S.Ct. 864)). "The Supreme Court has

noted that prison officials have 'wide latitude in the procedures they employ' when Ad Seg

---

[8] ("To state an Eighth Amendment claim, which requires a *mens rea* of deliberate indifference, a plaintiff must allege that the supervisor had 'subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it.'")(quoting *Tangreti*, 983 F.3d at 616, in turn quoting *Farmer*, 511 U.S. at 837).

is used to 'incapacitate an inmate who 'represents a security threat' and who remains a security risk throughout his confinement in Ad Seg." *Id*. (quoting *Proctor,* 846 F.3d at 609, in turn quoting *Hewitt*, 459 U.S. at 476-77 & n.9, 103 S. Ct. 864).

> The Second Circuit has identified three criteria that meaningful periodic reviews of continued Ad Seg confinement must satisfy: (1) the officials must actually evaluate whether the continued confinement is justified rather than simply go through the procedural motions guided by a preordained outcome (i.e., regardless of what the evidence shows); (2) the officials must evaluate whether the justification exists at the time of review or will exist in the future, considering new evidence related to changes in prison conditions and inmate behavior, although the officials are not barred from according significant weight to past events; and (3) the officials' purpose in continuing Ad Seg must be maintaining institutional safety and security or another valid reason rather than the desire to impose punishment on the inmate. *Proctor*, 846 F.3d at 610-11.

*Id.* To establish a due process violation against a supervisory official, a plaintiff must prove that the official was deliberately indifferent to the plaintiff's constitutional rights by failing to act on information indicating that unconstitutional practices were taking place. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

### a. Commissioner Annucci's Personal Involvement

The FAC alleges that Anthony J. Annucci, as Acting Commissioner of DOCCS, "is responsible for overall management and operation of DOCCS, including the care, custody, and control of all prisoners housed in DOCCS facilities, and assuring compliance with state and federal law. The DOCCS Commissioner has final policy-making and supervisory authority within DOCCS and was at all relevant times responsible for authorizing and maintaining the unconstitutional policies and customs challenged by [Plaintiff]." FAC ¶ 15. The FAC further alleges that "Defendant Annucci is aware of the unconstitutional policies

and practices used by DOCCS to keep inmates in solitary confinement for lengthy periods of time," indicating that Annucci has been a defendant "in at least 10 cases challenging the unconstitutional conditions and practices in connection with DOCCS Ad Seg." *Id.* ¶ 16. Plaintiff contends that despite Annucci's "awareness of the unconstitutional risk of harm to inmates, including [Plaintiff], Defendant Annucci has failed to remedy the unconstitutional policies and practices that enabled the violations of [Plaintiff's] rights." *Id.* Plaintiff alleges that "[t]he DOCCS Commissioner Defendants Annucci, Morley, O'Gorman, Koenigsman and Bellnier each had policy-making and supervisory authority within DOCCS and were personally involved in authorizing and maintaining the unconstitutional policies and customs that lead Plaintiff to spend more than 13 years in solitary confinement without meaningful or timely review. Through their policy-making and supervisory authority, each of Defendants Annucci, Morley, O'Gorman, Koenigsman and Bellnier could have ended [Plaintiff]'s time in unconstitutional solitary confinement but did not." *Id.* ¶ 79.  Plaintiff further alleges that "[e]ach of the Commissioner Defendants, Superintendent Defendants, SHU Defendant and SHMC Defendants were explicitly made aware, through [Plaintiff]'s administrative grievances, written complaints, attempted suicide, and abuse at the hands of prison guards, that [Plaintiff] was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement." *Id.* ¶ 83.  The FAC asserts that as a result of litigation against certain defendants regarding the unconstitutionality of Ad Seg conditions, "in addition to news articles and reports publicizing the inhumane conditions of solitary confinement, each of the Defendants knew that being confined in solitary confinement would deprive [Plaintiff] of basic life necessities, basic human dignity,

17

and the right to be free from cruel and unusual punishment. Each of the Defendants could have taken actions to remove [Plaintiff] from these patently unconstitutional conditions, yet did not." *Id.* ¶ 84. Instead, the FAC alleges, "and in the face of reports about [Plaintiff's] positive behavior, each of the Commissioner Defendants, Superintendent Defendants, SHU Defendant and SHMC Defendants failed to provide [Plaintiff] with meaningful reviews of his Ad Seg status and failed to transfer him from Ad Seg to the general prison population for more than a decade." *Id.* ¶ 85.

"[G]iven the abrogation of the *Colon* factors previously used to establish supervisory liability, the allegations regarding Annucci's policymaking authority and general awareness of unconstitutional practices are insufficient to adequately plead his subjective knowledge as to Plaintiff's situation specifically." *Williams*, 2021 U.S. Dist. LEXIS 196917, at *14.  "To the extent that Plaintiff asks the Court to infer that Annucci was aware of and personally involved in Plaintiff's injuries based simply on his position as Acting Commissioner, that is 'precisely the kind of inference about supervisory officials held impermissible by the Second Circuit in *Tangreti*.'" *Id.* at *14-15 (quoting *Zielinski v. Annucci*, No. 17-cv-1042, 547 F. Supp. 3d. 227, 2021 WL 2744684, at *8, 2021 U.S. Dist. LEXIS 124088, at *20 (N.D.N.Y. July 2, 2021)).  Further, as then-Chief Judge Suddaby explained in a case challenging Ad Seg, "Plaintiff must show that Defendant Annucci himself 'acted with deliberate indifference'—meaning that Defendant Annucci personally knew of and disregarded an excessive risk to Plaintiff's health or safety." *Hendrix*, 2021 U.S. Dist. LEXIS 183934 at *30 (quoting *Vega*, 963 F.3d at 273).

18

The allegations against Annucci are in many respects general and provide only background as to his authority over DOCCS matters. That being said, the FAC alleges that Annucci was "explicitly made aware, through [Plaintiff]'s administrative grievances, written complaints, attempted suicide, and abuse at the hands of prison guards, that [Plaintiff] was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement." FAC ¶ 83.  This appears to be nothing more than a broad, conclusory allegation.  The FAC does not allege that Plaintiff's appeal of the decision placing him in Ad Seq or his grievances about this confinement made their way to Commissioner Annucci. *See* FAC ¶ ¶ 88-90.  Nevertheless, "at the pleadings stage, courts recognize the common-sense principle that a plaintiff will often not be equipped to come forward with direct evidence of a defendant's subjective or actual knowledge or his intent." *Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *10 (S.D.N.Y. Sept. 28, 2021)(citing *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) ("A complaint is allowed to contain general allegations as to a defendant's knowledge, because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.") (citations omitted); Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.")). While it appears improbable that Annucci was aware of Plaintiff's written complaints, attempted suicide, or abuse at the hands of prison guards, it is not implausible. Thus, the Court will allow the Eighth Amendment claims to go forward against Annucci. *See Lewis v. Hanson*, No. 9:18-CV-

0012 (LEK/DJS), 2020 WL 1812556, at *4 (N.D.N.Y. Apr. 9, 2020).[9]  If Plaintiff can

establish Annucci's *mens rea* of deliberate indifference to Plaintiff's long-term solitary

confinement, then he might be able to establish Eighth Amendment claims against Annucci

based on the theory that Annucci failed to discontinue an unconstitutional policy. *See*

*Stone 1,* 2021 WL 4463033, at *8;[10] *Myers on behalf of Est. of Myers v. Davenport*, No.

1:21-CV-0922 (LEK/CFH), 2022 WL 3017367, at *5 (N.D.N.Y. July 29, 2022);[11] *Stone v.*

---

[9] ("[A] claim is plausible" and survives a motion to dismiss "if it is supported by enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].") (cleaned up)

[10] ("[W]here a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state—in this case, deliberate indifference—the Court is of the view that such official could be deemed to be personally involved in a constitutional violation.")

[11] In *Myers*, Judge Kahn wrote:

> [T]he Court finds that Plaintiff's fourth cause of action for deliberate indifference and failure to protect against Impiccatore and Carrion adequately alleges specific policy-making actions taken by those two defendants. These allegations bring this claim outside the type of supervisory liability precluded by *Iqbal* and *Tangreti*.

> *Tangreti* makes clear that, "after *Iqbal*, [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that a supervisor behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, *unless* that is the same state of mind required for the constitutional deprivation." 983 F.3d at 618 (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010)) (emphasis added). Thus, an official's conduct in making and executing policy, or failing to make or execute policy, may satisfy *Iqbal*'s requirement of personal involvement if such conduct meets the elements required to establish an underlying constitutional violation and is undertaken with the required state of mind. *Stone v. Annucci*, No. 20-1326, 2021 WL 4463033, at *8, 2021 U.S. Dist. LEXIS 186195, at *29–30 (S.D.N. Y Sept. 28, 2021) (stating that personal involvement exists "where a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state").

> Accordingly, a plaintiff may establish a policy-making official's personal involvement by, first, alleging facts from which it may be reasonably inferred the official was responsible for making relevant policies, and thus there is a tangible connection between their policymaking conduct and the alleged harm. *Stone*, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *36 (finding personal involvement where plaintiffs "plausibly alleged that [defendants] bore the responsibility for creating or allowing the continuance of policies and customs that allowed sexual violence at [DOCCS facilities] to occur.") (quoting *Pusepa v. Annucci*, No. 17-CV-7954, 2019 WL 690678, at *——, 2019 U.S. Dist. LEXIS 26292, at *5 (S.D.N.Y. Feb. 19, 2019)). Second, a plaintiff must establish the elements of the underlying claim directly against each defendant. For an Eighth Amendment failure to protect claim, those elements are that the defendant was aware of a risk of substantial harm to the plaintiff and—through their own

20

*Annucci*, No. 20-1326, 2021 WL 4463033, at *9, 2021 U.S. Dist. LEXIS 186195, at *30-33 (S.D.N. Y Sept. 28, 2021);[12] *Id.* at 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *36;[13] *see also Brunache v. Annucci*, No. 22-CV-196 (JLS), 2023 WL 146850, at *12 (W.D.N.Y. Jan. 9, 2023);[14] *Zielinski v. Annucci*, 547 F. Supp. 3d 227, 238 (N.D.N. Y 2021);[15] *but see Hendrix*, 2021 U.S. Dist. LEXIS 183934, at *33-34.[16]

The Court finds that the FAC does not allege facts plausibly establishing Commissioner Annucci's personal involvement in the Fourteenth Amendment claim.

[I]n the context of a Fourteenth Amendment procedural due process claim, to allege a supervisor-defendant's personal involvement, Plaintiff must allege that

---

actions in making a policy or failing to enact a policy—exhibited deliberate indifference and disregard for that risk.

2022 WL 3017367, at *5.

[12] (finding that "a senior prison official can still be held liable for his role in creating a policy by which violations of the Eighth Amendment occurred, but only if he can be shown to have acted with the necessary *mens rea* of deliberate indifference")

[13] (finding personal involvement where complaint alleged that defendant "as acting commissioner was at all relevant times responsible for enacting policies governing inmate safety and ensuring that such policies are enforced")

[14] ("While *Tangreti* overruled *Colon's* five-factor test, including factor (3), . . . it did not suggest that a defendant who created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, cannot be found liable under Section 1983. . . . [A] plaintiff may be able to establish an Eighth Amendment claim where a prison official allegedly 'promulgated an unconstitutional policy with a culpable mental state—in this case, deliberate indifference.'") (quoting *Stone #1,* 2021 WL 4463033, at *8–9)

[15] (plaintiff could establish Eighth Amendment denial of food claim against policymaking official if plaintiff directly established violation by showing official "personally knew of and disregarded an unreasonable risk of serious harm to plaintiff's health as a result of his [policymaking] conduct.")(citing *Tangreti*, 983 F. 3d at 629)

[16] ("The fact that Defendant Annucci may have been aware of general issues regarding prison conditions and the general effect that those issues may have on inmates does not plausibly suggest that Defendant Annucci had sufficient knowledge of the specific circumstances and details of Plaintiff's Ad Seg confinement. As a result, the Court finds that Plaintiff's citation to six prior lawsuits against DOCCS employees, some of which include Defendant Annucci, does not suffice to plausibly suggest either the existence of a DOCCS custom or policy or the fact that Defendant Annucci had personal knowledge of the specific circumstances regarding Plaintiff's Ad Seg confinement and disregarded an excessive risk to Plaintiff's health or safety.")

> Defendant Annucci violated the Fourteenth Amendment by Annucci's own
> conduct, and not by reason of Defendant Annucci's supervision of others who
> committed the violation. Specifically, Plaintiff must show, through factual
> allegations, three things: (1) that Defendant Annucci actually evaluated whether
> Plaintiff's confinement in Ad Seg was justified; (2) that Defendant Annucci
> evaluated whether the justification for Ad Seg existed at the time of the periodic
> review or will exist in the future, and considered new relevant evidence related
> to changes in the prison conditions and inmate behavior as it became available;
> and (3) that Defendant Annucci approved Plaintiff's continued Ad Seg term for
> the actual purpose of maintaining the prison's institutional safety and security,
> not including punitive reasons. *Smith v. Westchester Cnty.*, 19-CV-3605, 2021
> U.S. Dist. LEXIS 127483, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021);
> *Proctor*, 846 F.3d at 611.

*Hendrix*, 2021 U.S. Dist. LEXIS 183934, at *36 (N.D.N.Y. Sep. 27, 2021).

Here, like in *Hendrix*, Plaintiff fails to allege facts plausibly suggesting Annucci

satisfied any of these three things. Generally, Plaintiff alleges that Defendants violated his

Fourteenth Amendment right to procedural due process based on a lack of meaningful

periodic Ad Seg review. FAC ¶ 118. This, as Plaintiff contends, resulted in the denial of a

protected liberty interest in avoiding long-term solitary confinement. *Id.* However, Plaintiff

fails to allege specific factual instances as to Annucci's personal involvement in the

periodic Ad Seg review process. *See generally*, FAC.  Instead of providing factual

allegations showing Annucci's role in depriving Plaintiff of his procedural due process

rights, Plaintiff merely states that "[t]he *Defendants* deprived [Plaintiff] of a protected liberty

interest in avoiding long-term solitary confinement. The *Defendants* denied [Plaintiff] of

both meaningful and timely periodic review of his detention in Ad Seg, in violation of the

Fourteenth Amendment."  FAC ¶ 118 (emphasis added). However, there is no mention of

facts that demonstrate how Annucci's own conduct actually caused Plaintiff's procedural

due process deprivation. *See generally* FAC.

22

Further, nothing in the FAC indicates that the structure of the Ad Seg review process itself violates Procedural Due Process. Rather, Plaintiff challenges the way in which the Ad Seg review process played out for him. *See* FAC ¶¶ 25–29, 48–49, 59–76. The FAC does not allege that Annucci participates in the Ad Seg review process, so he could only be liable if he created and/or maintained policies and procedures establishing Ad Seg review that violated the Due Process Clause. As Plaintiff makes no claim that the review process is structured in an unconstitutional way, and because there are no allegations that Annucci participated in the Ad Seg review process, the Court will dismiss the Fourteenth Amendment cause of action as to Annucci.

### b. The Deputy Commissioner Defendants' Personal Involvement

Defendants argue that Plaintiff fails to establish that Defendants Morley, Koenigsmann, O'Gorman, and Bellnier [17] were personally involved in the claims in this case.  Plaintiff argues that he has asserted sufficient facts to withstand a motion to dismiss on the arguments presented by these Defendants.

Plaintiff points out that he alleges that Defendants Morley, Koenigsmann, O'Gorman, and Bellnier are or were DOCCS Deputy Commissioners, FAC ¶¶ 18-21, who, by virtue of their positions, "have [or had] policy-making and supervisory authority within DOCCS and were or are personally involved in authorizing and maintaining the unconstitutional policies and customs" at issue here. FAC ¶ 17. Furthermore, Plaintiff

---

[17] Defendant Morley is the Acting Chief Medical Officer and Deputy Commissioner of DOCCS. FAC ¶18. At some unspecified time, Defendant Koenigsmann held the position now occupied by Commissioner Morley. FAC ¶19. Defendant O'Gorman serves as the Deputy Commissioner for Correctional Facilities, and his duties "include reviewing and approving periodic reviews for incarcerated individuals' continuation in, or removal from, Ad Seg." FAC ¶20. Defendant Bellnier held Defendant O'Gorman's position "from approximately 2011 until his retirement in or about September 2017." FAC ¶21.

contends, the FAC alleges that the Deputy Commissioner Defendants "ha[d] the authority to make determinations whether to retain the inmate in solitary confinement" or release him. FAC ¶ 22.  Plaintiff alleges that "on at least one occasion since September 2017, each of the DOCCS Deputy Commissioner Defendants . . . reviewed, approved, and signed-off on the disciplinary review boards' continued decisions to keep [Plaintiff] confined in solitary confinement," and did so "in knowing disregard of the lack of penological justification" for it. FAC ¶ 22.  The FAC further alleges that "[e]ach of [Plaintiff]'s reviews require the signature of, and were signed by, one of the DOCCS Superintendents or one of the DOCCS Deputy Commissioners." FAC ¶74. The FAC alleges that the Deputy Commissioners "failed to conduct an independent analysis of [Plaintiff]'s circumstances," and instead "rubber-stamped" the disciplinary review board decisions, "denying [Plaintiff] his right to meaningful review." FAC ¶ 74.  Plaintiff contends that "[t]hrough their policy-making and supervisory authority, each of Defendants Annucci, Morley, O'Gorman, Koenigsman and Bellnier could have ended [Plaintiff]'s time in unconstitutional solitary confinement but did not." FAC ¶ 79. Rather, Plaintiff maintains, they signed off on his continued confinement, and failed to act to end that confinement despite their awareness of the risks of constitutional violations inherent in solitary confinement, and despite their awareness of "[Plaintiff]'s administrative grievances, written complaints, attempted suicide, and abuse at the hands of prison guards." FAC ¶ 83.

Defendants argue that "the relevant question is not whether any defendant disregarded the 'lack of justification' for solitary confinement, but whether the prison 'official knows of and disregards an excessive risk to inmate health or safety.'"  Def. MOL at 10

(quoting *Farmer*, 511 U.S at 837).  Plaintiff responds that even if this is the correct

standard, the allegations in the FAC satisfy it.  Plaintiff points out that he claims that

despite having knowledge of the substantial risks of solitary confinement, the Deputy

Commissioner Defendants nevertheless made the decision to "review[], approve[], and

sign[]-off" on [Plaintiff]'s continued solitary confinement without "conduct[ing] an

independent analysis." FAC ¶ ¶ 22, 74.  Instead, Plaintiff claims, they "rubber-stamped" the

review board decisions, and so demonstrated deliberate indifference. FAC ¶ 74.

Defendants note the FAC cites to 7 N.Y.C.R.R. §301.4(d)(3) to suggest that a

"Deputy Commissioner has the authority to make determinations whether to retain the

inmate in solitary confinement or to release the inmate from Ad Seg." FAC ¶22 and n. 4.

Defendants correctly indicate that Section 301(d)(3) expressly applies only to the Deputy

Commissioners for Correctional Facilities (Defendants O'Gorman or Bellnier), not all

Deputy Commissioners.  Defendants contend that even when limited to Defendants

O'Gorman or Bellnier, Section 301(d)(3) further limits its own application to scenarios

"[w]here the Deputy Commissioner for Correctional Facilities has notified the

superintendent that an inmate in administrative segregation is to receive central office

review."  Defendants argue that nothing in the FAC suggests either Defendant O'Gorman

or Bellnier notified any superintendent that Plaintiff would receive central office review,

triggering the process whereby Defendants O'Gorman and/or Bellnier would make the final

determination.  Defendants contend if such a notification had been made—an occurrence

not indicated by the FAC—"the central office committee shall then complete its report," and

forward the report along with any statement from the inmate to the Deputy Commissioner

of Correctional Facilities, who then makes a decision. *Id.* Defendants argue that nothing in the FAC suggests that central office review occurred, or that the central office review was forwarded to either Defendants O'Gorman or Bellnier for final decision. Rather, Defendants argue, the FAC simply alleges that the reviews took place at the facilities—not the central office. *See* FAC ¶29. Thus, Defendants maintain, the allegations of the Deputy Commissioners for Correctional Facilities' personal involvement in a due process violation are wanting.

Plaintiff counters that the FAC alleges *all* Deputy Commissioners' actual personal involvement in the confinement and the policies at issue, regardless of the § 301.4 procedure. *See* FAC ¶ 22 ("on at least one occasion since September 2017, each of the DOCCS Deputy Commissioner Defendants . . . reviewed, approved, and signed-off on the disciplinary review boards' continued decisions to keep [Plaintiff] confined in solitary confinement"). Plaintiff argues that whether this participation took place pursuant to § 301.4 specifically or some other set of circumstances is irrelevant for purposes of this motion.  Plaintiff contends that he is entitled to proceed beyond dismissal because he has alleged actual personal involvement by each of the Deputy Commissioner Defendants.  Pl. MOL at 14.

Although the allegations against the Deputy Commissioner Defendants are conclusory, the Court agrees with Plaintiff on this point. Given the allegation at FAC ¶ 22, which the Court must accept as true for purposes of this motion, Plaintiff has adequately

alleged facts plausibly indicating the Deputy Commissioners' actual personal involvement in the claims in this case. See *Williams,* 2021 U.S. Dist. LEXIS 196917, at *17-18.[18]

Defendants argue in their reply that affirming, denying, or modifying a disciplinary determination is insufficient to establish personal involvement. Def. Reply at 4 (citing *Abdur-Raheem v. Selsky*, 598 F. Supp.2d 367, 370 (W.D.N.Y. 2009); *Brown v. Annucci*, 2021 U.S. Dist. LEXIS 43011 at *20–21 (S.D.N.Y. March 8, 2021) (holding the affirmance of subordinate's determination was insufficient to establish personal involvement); *Smart v. Annucci*, 2021 U.S. Dist. LEXIS 14339 at *14 (S.D.N.Y. January 26, 2021) ("That Annucci and [a First Deputy Superintendent] failed to act on Plaintiff's complaints . . . through 'their own individual actions, have violated the constitution'" and "affirming the outcome of a prison hearing is insufficient to establish personal involvement") (quoting *Tangreti*, 983 F.3d at 615)).  Defendants did not raise this argument in their moving brief, and the Court generally does not consider the merits of an argument without affording Plaintiff an opportunity to respond.  However, the FAC asserts that the Deputy Commissioners, by virtue of their positions, "have [or had] policy-making and supervisory authority within DOCCS and were or are personally involved in authorizing and maintaining the unconstitutional policies and customs" at issue here. FAC ¶ 17. The FAC also alleges that

---

[18] ("The Court finds that the FAC plausibly alleges O'Gorman's personal involvement in the alleged violations of Plaintiff's Eighth and Fourteenth Amendment rights. . . .   From the allegations that O'Gorman approved Plaintiff's continued placement in solitary confinement, it is reasonable to infer that O'Gorman was subjectively aware of the risk that Plaintiff's constitutional rights were being violated by prolonged confinement in isolation, and that he disregarded that risk by approving his continued placement.  . . . Moreover, these allegations 'connect' O'Gorman to the review of Plaintiff's continued status in solitary and the alleged violation of Plaintiff's procedural due process rights.")(citing *Farmer*, 511 U.S. at 837; *H'Shaka*, 444 F. Supp. 3d at 376 (finding personal involvement of DOCCS defendants where they "were directly involved in the decision to keep Plaintiff in Ad Seg").

these defendants, "[t]hrough their policy-making and supervisory authority . . .  could have ended [Plaintiff]'s time in unconstitutional solitary confinement but did not." FAC ¶ 79. Thus, it is plausible that these defendants did more than simply affirm, deny, or modify a particular disciplinary determination.  Accordingly, the motion on this ground is denied, and Defendants are free to raise this argument on a motion for summary judgment.

Regarding Defendants Morley and Koenigsmann, the current and former Chief Medical Officer of DOCCS, respectively, FAC ¶¶18–19, Defendants point out that Plaintiff alleges they were responsible for the medical treatment of inmates confined in Ad Seg. *Id.* Defendants argue that, aside from a 2011 suicide attempt and a May 2014 mental health evaluation, *id.* ¶ 54, the FAC is devoid of any of Plaintiff's specific medical issues of which the Chief Medical Officers might know, and contend that "it is not clear from the FAC that the Chief Medical Officers would know these issues." Def. MOL at 8-9.  However, on this motion the Court must accept as true Plaintiff's allegation that "[e]ach of the Commissioner Defendants . . .  were explicitly made aware, through [Plaintiff]'s administrative grievances, written complaints, attempted suicide, and abuse at the hands of prison guards, that [Plaintiff] was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement." FAC ¶ 83.  While Plaintiff may not be able to establish this awareness as it relates to Defendants Morley and Koenigsmann, that is a factual issue that cannot be resolved on this motion.

Defendants also argue that "nothing in the FAC suggests that the Chief Medical Officers had any role in 'imposing sentences,' as alleged in the Second Cause of Action." Def. MOL at 9.  However, the Second Cause of Action seeks to impose liability because,

28

*inter alia*, the defendants knowingly allowed "[t]he Defendants' policy of indefinite and prolonged isolated confinement [that] imposed disproportionate punishment on [Plaintiff]" to "continue under their supervision and authority."  FAC ¶ ¶ 114, 116.  Thus, the claim is not premised solely on the imposition of a sentence. The motion on this ground is denied.

Defendants also draw a distinction between Morley and Koenigsmann (DOCCS' Chief Medical Officers) and the other Deputy Commissioner Defendants (O'Gorman and Bellnier), on the grounds that 7 N.Y.C.R.R. § 301.4 grants only Deputy Commissioners of Facilities—not Chief Medical Officers—a role in the Ad Seg review process. Def. MOL at 9. Plaintiff counters that the distinction is not relevant on this motion because the FAC specifically alleges that *all* of the Deputy Commissioner Defendants "reviewed, approved, and signed-off on the disciplinary review boards' continued decisions to keep [Plaintiff] confined in solitary confinement." FAC ¶ 22.  Again, the Court must accept this allegation as true for purposes of this motion, and therefore agrees with Plaintiff.  Defendants may move for summary judgment if discovery reveals no personal involvement by any individual Defendant.

### d. The Superintendent Defendants' Personal Involvement

The FAC asserts that Defendant Eckert serves as the Superintendent of Wende Correctional Facility; Defendant Colvin serves as the Superintendent of Five Points Correctional Facility; and Defendant Thoms serves as the Superintendent of Mid-State Correctional Facility. FAC ¶ 25. Defendants argue that the FAC fails to allege facts establishing the Superintendent Defendants' personal involvement in the Eighth Amendment claims.

29

As Defendants point out, the FAC asserts that a Special Housing Management Committee ("SHMC") was assigned to review the case of each individual in Ad Seg and make recommendations to the Superintendents as to whether each individual should continue in Ad Seg. FAC ¶ 29.  The FAC asserts that that the Superintendent Defendants "regularly rubber-stamped the determination [of the SHMC] without independent analysis." *Id.* ¶¶ 29, 72–73. Each of the Superintendents allegedly "approved, reviewed, and signed-off on the disciplinary review boards' continued decisions to keep [Plaintiff] in solitary confinement, in knowing disregard of the lack of justification for such confinement." *Id.* ¶¶ 25, 72-75.

Defendants argue that "[s]etting aside the conclusory language that the Superintendents acted in knowing disregard for Plaintiff's health and/or safety, the FAC indicates the extent of their personal involvement was relying upon the SHMC's recommendation. The FAC does not indicate that in a non-conclusory manner the Superintendents had reason to know the SHMC's recommendation was constitutionally wrong." Def. MOL at 12.  Defendants maintain:

> While the non-conclusory allegation in the FAC barely suffice to establish the Superintendents' personal involvement in the Fourteenth Amendment claims, they fail as to the Eighth Amendment claims. None of the non-conclusory allegations suggests any of the Superintendents actually "drew the inference" Plaintiff would be harmed by adopting the recommendation put before them by the John/Jane Does in review committees. *Farmer*, 511 U.S. at 837. Nothing in the FAC suggests that the Superintendents actually knew the John/Jane Does' recommendations created a significant risk of serious harm. At most, the FAC simply indicates that the recommendations were incorrect and that adopting those recommendations harmed Plaintiff. Accordingly, the FAC claim lacks sufficient allegations as to the Superintendents' personal involvement in the Eighth Amendment conditions of confinement claim.

30

*Id.*  Defendants also argue that the "FAC pleads no allegations—conclusory or otherwise—about the Superintendents' involvement with the 2006 'sentence' to Ad Seg. Accordingly, the Court should dismiss both Eighth Amendment Causes of Action as to the Superintendents." *Id.* at 13.

Plaintiff counters that "[t]he allegations against the Superintendent Defendants do not rise or fall with the merits of SHMC's recommendations; [Plaintiff] claims that despite knowledge that solitary confinement posed an unconstitutional risk of danger to these inmates, the Superintendent Defendants nevertheless (1) failed to take any actions to end that solitary confinement, and (2) 'failed to conduct an independent analysis of [Plaintiff]'s circumstances,' and instead 'rubber-stamped' the board decisions [that] authorized [Plaintiff]'s continued solitary confinement." Pl. MOL at 17 (quoting FAC ¶ 74).  Plaintiff contends that both of these facts established viable § 1983 claims for deliberate indifference.  *Id.*

In making this argument, Plaintiff points out that the FAC alleges that "[u]nder DOCCS regulations, the Superintendent of each facility is required to make an independent determination whether to retain the inmate in solitary confinement or to release the inmate from Ad Seg." *Id.* ¶ 25.  The FAC further asserts that by virtue of their positions, each Superintendent Defendant exercised broad "policy-making and supervisory authority with regard to *all* operations at their respective facilities." FAC ¶ 25 (emphasis added).  Colvin, Thoms, and Eckert purportedly "review[ed] disciplinary hearings" imposing solitary confinement, and so were "personally involved in the decision to confine inmates to Ad Seg and SHU, including [Plaintiff]." FAC ¶ 25.

31

The FAC asserts that "on at least one occasion since September 2017, each of the Superintendent Defendants reviewed and denied" [Plaintiff]'s "complaints and grievances submitted after [his] disciplinary hearings and approved, reviewed, and signed-off on the disciplinary review boards' continued decisions to keep [Plaintiff] confined in solitary confinement." FAC ¶ 25.  The FAC alleges that "[e]ach of [Plaintiff]'s reviews require the signature of, and were signed by, one of the DOCCS Superintendents or one of the DOCCS Deputy Commissioners." FAC ¶ 74.  However, Plaintiff contends, the Superintendents "failed to conduct an independent analysis of [Plaintiff]'s circumstances," and instead "rubber-stamped" the disciplinary review board decisions, "denying [Plaintiff] his right to meaningful review." FAC ¶ 74. Furthermore, the FAC asserts that "[t]hrough their policy-making authority, supervisory authority, and Ad Seg review responsibilities, each of Defendants Eckert, Colvin, and Thoms could have ended [Plaintiff]'s time in unconstitutional solitary confinement but did not." FAC ¶ 80.  And it asserts that each Superintendent Defendant had knowledge of the unconstitutional risk of harm to [Plaintiff] because "state regulation mandate[s] [superintendents'] involvement in the review of Ad Seg," and because the issues with solitary confinement are well-known. FAC ¶ 26.

When accepting the allegations in the FAC as true, and drawing reasonable inferences in Plaintiff's favor, Plaintiff has alleged enough to plausibly establish that the Superintendent Defendants were deliberately indifferent to Plaintiff's continuation in solitary confinement despite knowledge of reasons to end that confinement and their authority to do so.  While Plaintiff may not be able to establish the Eighth Amendment

claims against the Superintendent Defendants, the claims against them will be allowed to proceed to discovery.

### e. Director of Special Housing Venettozzi's Personal Involvement

Defendants move to dismiss claims against Defendant Venettozzi for lack of personal involvement. As Defendants point out, the FAC claims that Defendant Venettozzi's "authority includes reviewing, affirming, modifying, or reversing dispositions imposed at Tier III Hearings." FAC ¶27–28, 81. However, Defendants maintain, "the FAC does not allege that Defendant Venettozzi reviewed, affirmed, modified, or reversed the sole disciplinary infraction alleged in the FAC: the 2006 stabbing of an attorney to facilitate escape from custody." Def. MOL, Dkt. 42-1, at 13.  Defendants further point out that the FAC claims that Defendant Venettozzi "reviewed, approved, and signed-off on the disciplinary review boards' continued decisions to keep [Plaintiff] confined in solitary confinement, in knowing disregard of the lack of justification for such confinement." *Id*. (quoting FAC ¶ 76, and citing ¶ 81).  Nevertheless, Defendants contend, "the FAC pleads no factual support for its conclusory allegation regarding the incorrect legal standard. Even applying the correct *Farmer* standard, the FAC presents no allegations of fact that Defendant Venettozzi knew of and disregarded a substantial risk to Plaintiff's health simply by adopting the SHMC's recommendations." *Id*.  Accordingly, Defendants argue, the FAC does not adequately plead Defendant Venettozzi's personal involvement in the conditions of confinement claim. *Id*.

Defendants also argue that the Court should dismiss the due process claim as to Defendant Venettozzi.  In this regard, Defendants assert:

> While the FAC explains Defendant Venettozzi's role as SHU Director in the review of Tier III hearings (FAC ¶¶ 27, 81), the FAC contains no allegations of Defendant Venettozzi's role in the Ad Seg review process. This stands in contrast to the FAC's description of Superintendents' role in that process. *See* FAC ¶¶25, 29, 71–75. Rather, the FAC just contains the conclusory claim that Defendant Venettozzi "reviewed, approved, and signed-off on the disciplinary review boards' continued decisions." *Id.* ¶¶76, 81. This is the type of "unadorned, the-defendant-unlawfully-harmed-me-accusation" that the Supreme Court decried in *Iqbal*. 556 U.S. at 678. The Court should therefore dismiss the due process claim as to defendant Venettozzi.

*Id.* at 13-14.

Plaintiff argues that he has stated viable claims against Defendant Venettozzi. He points out that the FAC alleges that Venettozzi was the SHU Director, and so "ha[d] policy-making and supervisory authority with regard to SHU and the DOCCS disciplinary process." Pl. MOL at 17 (quoting FAC ¶ 27).  He further maintains that the allegations in the FAC assert that, as the SHU Director, Venettozi was responsible for "reviewing, affirming, modifying, or reversing dispositions imposed at Tier III Hearings." *Id.* (quoting FAC ¶ 27).  He also points out that the FAC alleges, "on at least one occasion since September 2017, Mr. Venettozzi reviewed, approved, and signed-off on the disciplinary review boards' continued decisions to keep [Plaintiff] confined in solitary confinement." *Id.* (quoting FAC ¶ 76).  Thus, Plaintiff contends, the FAC adequately alleges that Venettozzi was aware of the unconstitutional risk of harm from prolonged solitary confinement, and yet took no action to remedy the issues. *Id.* (citing FAC ¶ 28). Plaintiff argues that just as with the Superintendent Defendants, he has sufficiently alleged deliberate indifference as to Defendant Venettozzi.

As the Second Circuit stated:

34

In the DOCCS system, there are two relevant reasons for prison administrators to send an inmate to the SHU—Disciplinary Segregation and Administrative Segregation ("Ad Seg"). Disciplinary Segregation, as its name suggests, is designed to discipline an inmate found guilty of a "Tier III" violation, the most serious of three infraction levels in the DOCCS system. N.Y. Comp. Codes R. & Regs. tit. 7, §§ 270.2, 270.3(a)(3), 301.2. A Disciplinary Segregation term lasts "for a designated period of time as specified by the hearing officer." *Id.* § 301.2(a). Once that time elapses, the statute does not empower DOCCS to punish the inmate doubly for the same infraction by imposing further Disciplinary Segregation. *See id.*

Ad Seg serves a different purpose. As relevant here, Ad Seg removes an inmate from the general population when he "pose[s] a threat to the safety and security of the [prison] facility." *Id.* § 301.4(b). Given the importance of that purpose, Ad Seg is flexible and accords DOCCS officials substantial discretion in deciding whether to impose an Ad Seg term. Ad Seg terms are open-ended and do not require that DOCCS predetermine when it will release an inmate— "[a]t any time when deemed appropriate [by DOCCS], an inmate may be evaluated and recommended for return to general population." *Id.* § 301.4(e).

*Proctor v. LeClaire*, 846 F.3d 597, 602 (2d Cir. 2017).

Here, Plaintiff was not continued in Ad Seq for disciplinary reasons, and Plaintiff's reference to the "disciplinary review boards' continued decisions" does not make it so. *See Williams*, 2021 U.S. Dist. LEXIS 196917, at *17 n.7.[19] "[T]he FAC does not allege that Venettozzi was in fact involved in Plaintiff's initial placement in solitary, or that the initial placement in Ad Seg itself violated Plaintiff's constitutional rights." *Williams,* 2021 U.S. Dist. LEXIS 196917, at *22. "The only other allegation regarding Venettozzi is a conclusory statement that Venettozzi at some point reviewed, approved, and signed off on the 'disciplinary review boards' repeated decisions to keep [Plaintiff] in solitary confinement.'" *Id.* "This allegation is insufficient to plausibly allege facts indicating that

---

[19] ("This case does not implicate disciplinary hearings or the disciplinary process. The FAC does not explain what a "disciplinary review board" is, or its relevance here.").

Venettozzi had 'subjective knowledge of a substantial risk of serious harm' to Plaintiff specifically and disregarded that risk." *Id.* at *22-23 (citing *Tangreti*, 983 F.3d at 616). "The FAC also does not plausibly allege Venettozzi's personal involvement in the alleged violation of Plaintiff's procedural due process rights." *Id.* at *23 (citing *Abdul-Halim v. Bruyere*, No. 19-cv-740, 2021 WL 3783087, at *3, 2021 U.S. Dist. LEXIS 161441, at *7 (N.D.N.Y. Aug. 26, 2021) (noting that affirming the outcome of a prison hearing is not sufficient to establish personal involvement)). Accordingly, Plaintiff's Section 1983 claims against Venettozzi are dismissed.

### Motion for Reconsideration

Defendants' motion for partial reconsideration asks the Court to overturn its Order on two grounds: (1) that the claims against Defendant Bellnier could not have accrued within the statute of limitation period because he retired in September 2017, and (2) that [Plaintiff]'s Second Cause of Action is time-barred.

### a.  Claims against Defendant Bellnier

The Court explained in its Order that, in light of the three-year statute of limitations and filing date of the instant action, [Plaintiff]'s "claims must have accrued after September 24, 2017." Ord. at 3.  Prior to the Court's determination of the first motion to dismiss, Defendants asserted in their reply brief:

> Plaintiff alleges Defendant Bellnier retired from DOCCS in September 2017. FAC ¶21. In the very next paragraph, Plaintiff alleges that Bellnier took action on at least one occasion since his retirement. FAC ¶22. These contradictory assertions do not satisfy the facial plausibility standard. *See Iqbal*, 556 U.S. at 678. Any act that defendant Bellnier took under color of state law—*i.e.*, before he retired—would necessarily be outside of the statute of limitations.

Defendant Bellnier should be dismissed from the complaint for this reason alone.

Dkt. 32 at 8.

Defendants now argue that "[t]he FAC acknowledges Defendant Bellnier retired from DOCCS in September 2017," and that, "[i]nexplicably, the very next paragraph claims Defendant Bellnier violated Plaintiff's constitutional rights *after* retirement." Def. MOL at 14. (citing FAC ¶¶ 21-22)(emphasis in Def. MOL). Defendants further argue that "[g]iven the FAC's acknowledgment that Defendant Bellnier retired outside of the statute of limitations, the Court should dismiss the FAC in its entirety as to him." *Id.* at 15.

However, as Plaintiff points out, Defendants incorrectly assert that the FAC acknowledges that Defendant Bellnier retired outside of the statute of limitations. Pl. MOL at 20.  Rather, the FAC asserts that Defendant Bellnier "was the Deputy Commissioner for Correctional Facilities from approximately 2011 until his retirement in or about September 2017," and that "on at least one occasion since September 2017, each of the DOCCS Deputy Commissioner Defendants . . .  reviewed, approved, and signed-off on the disciplinary review boards' continued decisions to keep [Plaintiff] confined in solitary confinement, in knowing disregard of the lack of penological justification for such confinement." FAC ¶¶ 21-22.  While the phrase "since September 2017" is open to differing interpretations, Plaintiff argues that the allegations in the FAC "raise the plausible inference that Defendant Bellnier was working at the DOCCS for at least a seven-day period within the relevant statute of limitations—September 24, 2017 to September 30, 2017." Pl. MOL at 20.

37

Defendants counter in their reply:

> While Plaintiff's opposition to the motion seeks to focus the Court on the possibility that he took action in the last few days in September, dkt. 45 at 20, the FAC makes no such allegation.  Rather, the FAC alleges Defendant Bellnier took action "on at least one occasion since September 2017." FAC ¶22; *accord. id.* ¶ 74. Reading paragraphs 21 and 22 of the FAC together, Plaintiff alleges that Defendant Bellnier's relevant conduct took place after his retirement. The FAC alleges no conduct by Bellnier in the timeframe between September 25, 2017 . . . and the end of September 2017. Plaintiff's argument in opposition to this motion does not change what the FAC itself pleads.

Def. Reply MOL at 9.  Further, Defendants indicate in a footnote that "[i]f this case proceeds forward against Defendant Bellnier, documentary evidence will establish his retirement date as September 5, 2017, so anything Defendant Bellnier did within the statute of limitations could not have been under color of state law." *Id.* at 9, n. 3.

As indicated above, a motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking 'a second bite at the apple[.]'" *Analytical Surveys, Inc.*, 684 F.3d at 41. Here, the basis for Defendants' motion for reconsideration relative to Defendant Bellnier (i.e.  the allegations in the FAC) existed at the time Defendants made their first motion to dismiss, and therefore it appears they are attempting to relitigate old issues, secure a rehearing on the merits, or otherwise take a second bite at the apple.

Further, to the extent that Defendants now contend that the Court may have overlooked this argument because the Court did not reference it in the Order, the issue Defendants raise would not have changed the Court's decision. *See Key Mechanical, Inc.*

38

*v. BDC 56 LLC*, 330 F.3d 111, 123 (2d Cir. 2003).[20]  Because the Court may only review the allegations asserted in the FAC, and must provide the non-movant reasonable inferences from those allegations, the Court would have concluded - as Plaintiff argues now – that the allegations in the FAC "raise the plausible inference that Defendant Bellnier was working at the DOCCS for at least a seven-day period within the relevant statute of limitations—September 24, 2017 to September 30, 2017."  While Defendants are likely to prevail on this issue at summary judgment, that is not a recognized reason the grant reconsideration.[21] Accordingly, Defendants motion for reconsideration on this issue is denied.

### b.  Second Cause of Action

Citing to allegations in the FAC that "[Plaintiff]'s time in solitary confinement was based on a single violent incident in 2006 that occurred before his sentencing," and that the Director of Special Housing/Inmate Discipline denied Plaintiff's April 2006 appeal of the decision placing him in Ad Seq, *see* FAC ¶ ¶ 4, 88, Defendants argue that "[t]o the extent that the Court reads the FAC's second cause of action to challenge an April 2006 decision, such a claim is untimely."  Def. MOL at 15.  Defendants contend that the Court should "view the second Eighth Amendment cause of action as a challenge to the April 2006 determination because the claim would otherwise be duplicative of either the first cause of

---

[20] (explaining that a party seeking reconsideration must identify "factual matters . . . [the court] overlooked that would have changed its decision")

[21] While the Court will not advise the parties on how to litigate this matter, it seems that if Defendants present Plaintiff documentary evidence establishing Defendant Bellnier retirement date as September 5, 2017, there may be a basis for a stipulated resolution as to the claims against this defendant.

action (also Eighth Amendment) or the third cause of action (procedural due process)." *Id.*

In this regard, Defendants argue:

> If the second cause of action is truly a challenge to a grossly disproportionate sentence, as it is framed on page 32 of the FAC, that sentence was imposed in 2006—well outside the statute of limitations. If the Court construes the second cause of action as a challenge to the Ad Seg review process, it would be duplicative of the third cause of action regarding procedural due process in the Ad Seg review process. *See Strasser v. New York*, 2012 U.S. Dist. LEXIS 11802 at *2, *19 n.12 (N.D.N.Y. January 26, 2012) (dismissing an Eighth Amendment cause of action as duplicative of "procedural due process violations . . . arising out of disciplinary confinement"). In order for the second cause of action to stand alone—distinct from the remaining causes of action—it would have to be read as challenging a 2006 action.

*Id.* at 15-16.

Defendant's motion in this regard is denied. Despite being aware of the Second Cause of Action when briefing their first Motion to Dismiss, Defendants never raised their current arguments. As the Second Circuit has explained, the Court should not provide Defendants with an unwarranted and unjustified second bite at the apple to raise new arguments they could have previously raised. *Analytical Surveys*, 684 F.3d at 52.  A motion for reconsideration is not a way to "advance new facts, issues or arguments not previously presented to the Court," *Polsby*, 2000 WL 98057, at *1, and it is not a proper vehicle for a party "to repackage and relitigate arguments and issues already considered by the Court" or to "raise new arguments and issues" not before the Court when it decided the motion the first time. *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 332 (E.D.N.Y. 2013); *see Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005).[22]

---

[22] (A motion for reconsideration is not "an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced.")

Furthermore, Defendants' request to dismiss the Second Cause of Action improperly asks the Court to resolve factual questions at the pleading stage about the accrual date of [Plaintiff]'s constitutional claims. The Court's Order denying Defendants' previous attempt to dismiss the Second Cause of Action explained that [Plaintiff]'s "Eighth Amendment claims are substantially premised on his thirteen-year-long confinement in Administrative Segregation." Ord. at 4 (citing FAC ¶ 2). The Order further highlighted that "[t]he accrual date for Plaintiff's Eighth Amendment claims (and thus the beginning of the limitations period) is necessarily a question of fact that requires a 'close assessment of the conditions to which [Plaintiff] was subjected,' something that cannot be done at the pleading stage." Ord. at 4 (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015)).  By asking the Court to now dismiss the Second Cause of Action as time barred, Defendants seek to overturn the Court's prior conclusion that the statute of limitations period must be decided as a question of fact. The Defendants have provided no new basis for the Court to reconsider its prior decision on that point, and therefore the motion for reconsideration in this regard is denied.

**Motion to Transfer Venue**

Defendants motion to transfer venue consists of the contention in the "Preliminary Statement" section of Defendants' brief that "[t]he Court may also wish to sever the claims against Defendants Colvin and Eckert and transfer them—along with John/Jane Does 1–5 and 11–15—to the United States District Court for the Western District of New York, where the actions allegedly performed by them took place, where the evidence concerning those allegations is presumably located, and where Plaintiff is incarcerated," Def. MOL at 2, and the statement in the "Conclusion" section of that brief that "the Court should consider

41

transferring the Defendants and John/Jane Does whose conduct occurred in Five Points and/or Wende to the Western District of New York." *Id.* at 16.

Defendants have not carried the burden of making out a strong case for transfer such to overcome Plaintiff's choice of forum. Defendants have not identified key witnesses, the nature of these witnesses' likely testimony, or supported the putative witnesses' statements with affidavits.  Defendants have also not addressed the location of relevant documents and the relative ease of access to sources of proof, the convenience of the parties, the availability of process to compel the attendance in this District of unwilling witnesses, or the relative means of the parties. Accordingly, Defendants' motion to transfer venue is, at this time, denied.

### CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss, for reconsideration, and to transfer venue, Dkt. 40, is **GRANTED in part and DENIED in part.** The motion is granted in that the Fourteenth Amendment procedural due process claim against Defendant Anthony J. Annucci, is **DISMISSED,** and all claims against Defendant Donald Venettozzi are **DISMISSED.**  The motion is denied in all other respects.

**IT IS SO ORDERED.**

Dated: March 16, 2023

Thomas J. McAvoy
Senior, U.S. District Judge