**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

KAYSON PEARSON,

                 Plaintiff,

        -v-                       9:20-CV-01175 (AJB/CBF)

ANTHONY ANNUCCI, *et al.*,

                 Defendants.

**Hon. Anthony Brindisi, U.S. District Judge:**

## DECISION & ORDER

### I. INTRODUCTION

Plaintiff Kayson Pearson commenced this action asserting that defendants Anthony Annucci, John Morley, James O'Gorman, Carl Koenigsmann, Joseph Bellnier, John Colvin, Stewart Eckert, and Matthew Thoms violated his rights under the Eighth and Fourteenth Amendments of the United States Constitution. Pearson contends that while in the custody of the New York Department of Corrections and Community Supervision ("DOCCS") he was subjected to over a decade of solitary confinement without appropriate periodic reviews. Pearson claims that defendants violated the Eighth Amendment by imposing cruel and unusual punishment and by "imposing grossly disproportionate sentences to solitary confinement that served no penological purpose," and violated his Fourteenth Amendment right to procedural due process by failing to provide meaningful review.

Before the Court is defendants' motion for summary judgment and Pearson's motion to preclude the opinions of defendants' expert, Dr. Jacqueline Bashkoff. *See* Dkt. Nos. 94, 95. For

1

the reasons set forth below, defendants' motion is **GRANTED IN PART and DENIED IN PART**, and Pearson's motion is **DENIED.**

### II.   BACKGROUND

"In the DOCCS system, there are two relevant reasons for prison administrators to send an inmate to the SHU—Disciplinary Segregation and Administrative Segregation ("Ad Seg")." *Proctor v. LeClaire*, 846 F.3d 597, 601 (2d Cir. 2017).  Disciplinary Segregation is "a punitive designation imposed in response to inmate behavior." *Peoples v. Annucci*, 180 F. Supp. 3d 294, 298 n.7 (S.D.N.Y. 2016).  Thus, a Disciplinary Segregation term is "imposed from a retrospective vantage—prison officials look back at misconduct and mete out a suitable punishment." *Walker v. Bellnier*, 146 F.4th 228, 237 (2d Cir. 2025).  Such a term "lasts 'for a designated period of time as specified by the hearing officer.'" *Proctor*, 846 F.3d at 601 (quoting 7 N.Y.C.C.R.R. § 301.2(a)).  "Once that time elapses, the statute does not empower DOCCS to punish the inmate doubly for the same infraction by imposing further Disciplinary Segregation." *Proctor*, 846 F.3d at 601.

On the other hand, an order committing a person to Ad Seg is "prospective and indeterminate[:] It sets no end date, and its premise is not past misconduct but the forward-looking assessment of prison officials that an individual's 'presence in [the] general population would pose a threat to the safety and security of the facility.'" *Walker*, 146 F.4th at 237 (quoting 7 N.Y.C.R.R. § 301.4(b)).

Within fourteen days of a person's initial admission to Ad Seg and placement in a facility's Special Housing Unit ("SHU"), "DOCCS would conduct a written disposition 'set[ting] forth specific reasons why administrative segregation [was] warranted.'" *Walker*, 146 F.4th at 239 (quoting 7 N.Y.C.R.R. § 301.4(a)).  "If such a disposition was made, the individual would

remain in the SHU, in Ad Seg status; if not, the person would be returned to the general prison population." *Walker*, 146 F.4th at 239. "Assignment to Ad Seg is permitted as long as, but only as long as, the designated individual '*remains* a security risk.'" *Walker*, 146 F.4th at 237 (quoting *Proctor*, 846 F.3d at 611).

"There is, however, a constitutional ceiling on that flexibility[.]" *Proctor*, 846 F.3d at 601. To prevent the use of Ad Seg status as pretext to commit an inmate to the SHU indefinitely, the Constitution "mandates that prison officials periodically review whether an inmate continues to pose a threat to the facility." *Proctor*, 846 F.3d at 601 (citing *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983)).

This process consisted of three steps:

First, a three-member committee—"commonly referred to as the "Facility Committee," consisting of 'a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff,'"—would convene to examine the inmate's institutional record. *See Proctor*, 846 F.3d at 601–02 (quoting 7 N.Y.C.R.R. § 301.4)). The Facility Committee then prepared a report. The report was required to set forth:

(i)    reasons why the inmate was initially determined to be appropriate for administrative segregation;

(ii)   information on the inmate's subsequent behavior and attitude; and

(iii)  any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation.

7 N.Y.C.R.R § 301.4(d)(1) (2020).

Second, "the Facility Committee provided its report, along with any written statement received from the inmate, to the Central Office Committee." *Walker*, 146 F.4th at 240 (citing 7 N.Y.C.R.R. § 301.4(d)(2) (2020). The three-person, Albany-based Central Office Committee

consisted of "a representative from the office of facility operations, a member of the department's inspector general's staff, and an attorney from the office of counsel." 7 N.Y.C.R.R. § 301.4(d)(3) (2020); *see also* McCarthy Decl., Dkt. No. 94-15 ¶¶ 8, 21 (committee comprised of the Director of the Crisis Intervention Unit or his designee, an attorney representative from DOCCS' Counsel's office, and a representative from the Office of Special Investigations); McCarthy Decl., Dkt. No. 94-15 ¶ 23 ("The only restriction on membership in the [Central Office Committee] is that the employee who made the initial recommendation for placement in Ad Seg for a particular inmate shall not serve as a member of that inmate's periodic review board."). The Central Office Committee would then "develop[] its own recommendation whether the inmate continues to pose a safety threat to the facility[.]" *Proctor*, 846 F.3d at 602.

Third, "the Central Office Committee transmitted both reports to the Deputy Commissioner for Correctional Facilities." *Walker*, 146 F.4th at 240. The Deputy Commissioner would review the two committees' recommendations, as well as the inmate's written statement when applicable, and decide whether to have the inmate remain in Ad Seg. *See Proctor*, 846 F.3d at 602 (citing 7 N.Y.C.R.R. § 301.4(d)(3) (2020)).

Once the Deputy Commissioner made a final decision, they were "bound to provide the designated individual "notice" of the decision and to 'state[ ] the reason(s) for the determination.'" *Walker*, 146 F.4th at 240 (quoting 7 N.Y.C.R.R. § 301.4(d)(4)). By regulation, "[t]he notice was also required . . . to include a statement [] explain[ing] that the designated individual had an opportunity to respond to his reviews in writing." *Walker*, 146 F.4th at 240.

"DOCCS followed this process to review its Ad Seg determinations every 60 days until July 2017, when it began to conduct its reviews on a 30-day cycle." *Walker*, 146 F.4th at 240.

In August 2004, Pearson was committed to the custody of DOCCS for kidnapping, rape, murder, and sodomy.  Dkt. No. 94-2 ¶¶ 1, 2; Dkt. No. 107 ¶¶ 1, 2.  He was first incarcerated as a member of DOCCS' general population, consistent with standard DOCCS practice.  However, in January 2006, at a court appearance for the above offenses, Pearson stabbed his lawyer in the neck with a plastic object in an attempted escape.  Dkt. No. 107 ¶ 11.  Based on his actions during the January 2006 sentencing hearing, on April 15, 2006, DOCCS recommended that Pearson be placed in Ad Seg status.  Dkt. No. 94-2 ¶ 13; Dkt. No. 107 ¶ 13 (citing Haner Decl., Ex. B Bates # 848).

Pearson spent the next twelve years in Ad Seg.  In that time, Pearson accumulated four misbehavior incidents resulting in discipline.[1]  Inmate Disciplinary History, Dkt. No. 94-19 at 41.  Two of the four incidents happened in the first two or three months of Pearson's Ad Seg confinement—the first, on June 30, 2006, for failing to obey a direct order; the second, on August 23, 2006, for lewd conduct.  Dkt. No. 94-19 at 41; *see also* Dkt. No. 105-15 at 4 ("[O]fficer states [Pearson] refused to clean up the cell after toilet overflowed[;] verbal testimony by [Pearson] admitting to such and plea of guilt."); Dkt. No. 105-16 at 2 (disciplinary report for masturbating in front of female officer).

Pearson's third disciplinary incident, for an unhygienic act, did not occur until June 16, 2011—nearly five years into his Ad Seg confinement.  Inmate Disciplinary History, Dkt. No. 94-

---

[1] Defendants' motion and statement of material facts assert Pearson accumulated five misbehavior incidents during his time in Ad. Seg.  *See* Dkt. No. 94-1 at 13 (citing O'Gorman Decl. Ex. A); *id.* at 26 (citing Ex. B Bates #1263); *id.* at 27 (citing  Review dated 10/07/2014); *id.* at 29 (citing Bates #992, Mar 15, 2010); Dkt. No. 94-2 ¶ 14 (citing O'Gorman Decl. Ex. A; Haner Decl., Ex. B Bates #1263).

The document kept by DOCCS detailing Pearson's disciplinary history lists four incidents dated *after* April 15, 2006.  *See* Dkt. No. 94-19 at 41.  Those four each contain notes regarding the conduct that warranted discipline.  *See, e.g.*, *id.* ("Incident: 06/24/06[;] Direct Order"); *id.* ("Incident: 06/16/11[;] Unhygienic Act").  The report also includes one incident dated April 15, 2006, labeled only "Admin Seg."—the date that DOCCS recommended Pearson be placed in Ad. Seg.  *See* Dkt. No. 94-19 at 41.

19 at 41; *see also* Dkt. No. 105-18 ("Pearson had taken feces and had made tic-tac-toe symbols on the walls and [] ceiling of the cell."). Then, three years later, in September 3, 2014, Pearson was disciplined for interference, harassment, threats, and failure to obey a direct order. Inmate Disciplinary History, Dkt. No. 94-19 at 41 ("When I attempted to answer Pearson's question he became aggressive and stated, "I will chop you up you stupid cunt." I gave Pearson a direct order to stop but he continued to yell and scream profanities.").

After another three or so years in Ad Seg, Pearson began participating in DOCCS' step-down program in mid-to-late 2018. *See* Dkt. No. 94-2 ¶¶ 21, 22. On August 14, 2019, Pearson was placed in general population. Dkt. No. 94-2 ¶ 24; Dkt. No. 107 ¶ 24 (citing Thoms Decl., Ex. A). All told, Pearson was housed at Upstate Correctional Facility from December 15, 2006, to May 23, 2016; at Five Points Correctional Facility from May 23, 2016, to January 11, 2018; and at Wende Correctional Facility from January 11, 2018, to April 17, 2018. Dkt. No. 94-1 at 13. Pearson was then housed at Mid-State Correctional Facility in the step-down program between April 17, 2018, and August 14, 2019. Dkt. No. 94-1 at 13. On August 14, 2019, Pearson was transferred to Wende and placed in general population. Dkt. No. 94-1 at 14.

### III.    PROCEDURAL HISTORY

On September 25, 2020, Pearson filed this action under 42 U.S.C. § 1983, initially against defendants Annucci, Morley, O'Gorman, Koenigsmann, Bellnier, Colvin, Thoms, Eckert, Venettozzi, Prack, and fifteen unnamed members of DOCCS mental health staff. *See* Compl., Dkt. No. 1 at 1. At the time, Pearson alleged that all defendants violated his Eighth Amendment rights against cruel and unusual punishments ("Count One") and the imposition of grossly disproportionate sentences ("Count Two"), as well as his Fourteenth Amendment right to procedural due process ("Count Three"). *Id.* at 22–25.

On February 11, 2021, Pearson filed an amended complaint, which is the operative pleading. Dkt. No. 23 ("Am. Compl."). While expanding upon certain factual allegations, the amended complaint asserted the same causes of action against the same defendants. *See id.* at 30–34.

Early motion practice followed. This included an initial motion to dismiss, which the amended complaint rendered moot. *See* Dkt. Nos. 21 & 25. After Pearson filed the amended complaint, defendants filed a second motion to dismiss on March 24, 2021. Dkt. No. 26. Senior U.S. District Judge Thomas J. McAvoy denied the motion with leave to renew on March 21, 2022. Dkt. No. 41. Accordingly, defendants renewed on April 18, 2022. Dkt. No. 42.

On March 16, 2023, Judge McAvoy granted in part, and denied in part, defendants' motion to dismiss, for reconsideration, and to transfer venue. Dkt. No. 50. More specifically, Judge McAvoy dismissed Pearson's Fourteenth Amendment claim against Annucci and all claims against Venettozzi but denied all other parts of the motion. *Id.* at 42.

Deadlines for discovery and dispositive motions were set for summer and fall 2024, Dkt. No. 63, and then extended into early 2025, Dkt. No. 69. Additional discovery disputes and extensions, as well as further motions practice, followed. *See, e.g.*, Dkt. Nos. 8, 89, 91.

Defendants filed the instant motion for summary judgment on April 18, 2025. Dkt. No. 95 ("Defs.' Mot. Summ. J."). Pearson filed a response on June 26, 2025, Dkt. No. 109 ("Pl.'s Resp."), and defendants submitted a reply on August 1, 2025, Dkt. No. 114 ("Defs.' Reply").

Once fully briefed, this matter was reassigned from Judge McAvoy to this Court on August 5, 2025. Dkt. No. 118. Oral argument on the motion for summary judgment was held on November 11, 2025.

## IV.    DISCUSSION

As an initial matter, Pearson has chosen to drop his claims against defendants Annucci, Koenigsmann, and Morley.  *See* Pl.'s Resp., Dkt. No. 108 at 7 n.1.  Therefore, the Court will enter summary judgment in their favor.

Left outstanding are Pearson's claims against defendants Bellnier and O'Gorman, the former Deputy Commissioner of Corrections between November 2011 and September 2017 and September 2017 and December 2020, respectively, *see* Dkt. No. 94-1 at 11, and defendants Colvin, Eckert, and Thoms, former superintendent of the facilities that housed Pearson during his Ad Seg confinement.

### A.    Motion for Summary Judgment

Under Rule 56, summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th 674, 686 (2d Cir. 2023) (quoting *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017)).

A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Hilton v. Wright*, 928 F. Supp. 2d 530, 544 (N.D.N.Y. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "In reviewing the motion, the district court must 'draw all reasonable inferences against the party whose motion is under consideration.'"  *Lake v. HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 215 (N.D.N.Y. 2024) (quoting *Williams v. MTA Bus Co.*, 44 F.4th 115, 125 (2d Cir. 2022)).  However, "[a] question of material fact does not exist merely because plaintiff disagrees with the deposition testimony and

8

documentary evidence produced by defendant[s]." *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 131 (E.D.N.Y. 2023) (citing *Anderson*, 477 U.S. at 247–48).

When a moving party has carried its burden under Rule 56(c), its opponent "must provide more than conclusory allegations . . . and show more than some metaphysical doubt as to the material facts." *See Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S De R L De C.V.*, 147 F.4th 73, 85 (2d Cir. 2025) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).  Rather, "[t]he non-moving party 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.'" *Murrell v. Moscicki*, 790 F. Supp. 3d 213, 220 (W.D.N.Y. 2025) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  "Indeed, 'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" *Campbell v. Belgard*, 765 F. Supp. 3d 234, 241 (W.D.N.Y. 2025) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

"In sum, the ultimate test 'is whether the evidence can reasonably support a verdict in plaintiff's favor.'" *Waltman v. United Servs., Inc.*, 635 F. Supp. 3d 86, 98–99 (D. Conn. 2022) (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Waltman*, 635 F. Supp. 3d at 99 (quoting *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015)).

### 1.      Personal Involvement

"To establish liability against an official under § 1983, a plaintiff must show the 'personal involvement of defendants in alleged constitutional deprivations.'" *Murray v. Noeth*, 774 F. Supp. 3d 621, 629 (W.D.N.Y. 2025) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).

9

"The theory of respondeat superior is unavailable in a § 1983 action." *Id.* (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)). Rather, "a plaintiff must . . . prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)).

Defendants assert that Colvin, Eckert, and Thoms ("Superintendent defendants") were not personally involved in any alleged constitutional violation, therefore, all claims against the three should be dismissed. Defs.' Mot. Summ. J., Dkt. No. 94-1 at 23.

As with most of their arguments, defendants ask the Court to sift through oversized, convoluted briefs to find support for this. Yet in that search, the Court primarily encounters a string of "discussed below," "based on the above," "the record is clear," and so on—phrases that lead everywhere but to the point. *See, e.g.*, Defs. Mot. Summ. J., Dkt. 94-1 at 20 ("[T]he record before the Court demonstrates that the DOCCS Superintendent Defendants had no personal involvement in Plaintiff's continued confinement in Ad Seg[;] [i]ndeed, Plaintiff's arguments to the contrary suggest a misunderstanding of the Ad Seg landscape, *i.e.*, between 'Central Office review' or statewide Ad Seg and facility-level Ad Seg.") (citing nothing); *id.* at 23 ("Accordingly, based on the above, Plaintiff cannot demonstrate the Superintendent Defendants' personal involvement in any alleged constitutional violation"); *id.* at 22 ("[T]he Superintendent Defendants had no control over Plaintiff's release, as indicated above."); Defs.' Reply, Dkt. No. 114 at 16 ("For reasons stated in Defendants' opening brief, and those stated below, Plaintiff cannot establish the personal involvement of defendants Eckert, Thoms, or Colvin"); Dkt. No. 114 at 16 ("For reasons explained in Defendants' opening brief, Plaintiff's assertions are belied by the record").[2]

---

[2] Even in a span of just three sentences, the handwaving is clear:

Where defendants do provide support, they cite caselaw to support factual assertions and the record for legal assertions. *See, e.g.*, Defs.' Mot. Summ. J., Dkt. No. 94-1 at 21 ("Insofar as Plaintiff attempts to allege the Superintendent Defendants' involvement based solely on their limited review of the Ad Seg review documentation at the facility level, this is not enough to sufficiently allege their personal involvement. *See, e.g.,* Colvin Decl. ¶¶ 18-20."); Dkt. No. 94-1 at 22 ("Plaintiff cannot establish that the Superintendent Defendants, by their own individual actions, violated Plaintiff's constitutional rights, since the final determination whether to release an individual from Ad Seg lies with the Deputy Commissioner and the Deputy Commissioner alone. *See* McCarthy Decl. ¶30; O'Gorman Decl. ¶19; Bellnier Decl. ¶16."); Dkt. No. 94-1 at 22 ("There is no indication in the record before the Court that the Superintendent Defendants 'knew of, and disregarded, an excessive risk to the plaintiff's health or safety.' *H'Shaka*, 444 F. Supp. 3d at 377."); Dkt. No. 94-1 at 20–21 ("There is no dispute that DOCCS designated [Pearson] under a 'Central Office review' pursuant to the framework set forth above. This is not the same procedure as a facility-level Ad Seg review, where the superintendent makes a determination to retain or release the inmate. *Walker v. Bellnier*, 2020 WL 9264839, at *2 (N.D.N.Y. Dec. 1, 2020)[.]") (cleaned up); *see also* Dkt. No. 94-1 at 21 ("During the Central Office review Ad Seg procedure, the facility superintendent *statutorily* has no control over whether an individual is released from Ad Seg and their contribution, if at all, is limited to 'refer[ring] the report and

---

With respect to Plaintiff's Fourteenth Amendment procedural due process claim, the Second Circuit has identified three criteria (discussed below) that meaningful periodic reviews of Ad Seg confinement must satisfy, which center on the evaluation of the individual's continued confinement. *See Tangreti*, 983 F.3d at 618. The record is clear that Eckert, Thoms, and Colvin had no involvement in evaluating whether Plaintiff remained confined in Ad Seg and were never on the facility-level or Central Office committee that reviewed Plaintiff's Ad Seg status. Accordingly, based on the above, Plaintiff cannot demonstrate the Superintendent Defendants' personal involvement in any alleged constitutional violation, and the Eighth and Fourteenth Amendment claims against them should be dismissed.

Defs.' Mot. Summ. J., Dkt. No. 94-1 at 22–23.

11

inmate statement to a three-member Central Office committee.") (citing *Walker*, 2020 WL 9264839, at *2) (emphasis added).

Another of defendants' unavailing tactics: the rhetorical device of conclusorily proclaiming Pearson is wrong—followed by only a pincite to Pearson's opposition papers. *See, e.g.*, Defs.' Reply, Dkt. No. 114 at 16 ("Plaintiff conflates statements made by the Superintendent Defendants respecting their role in a facility level Ad Seg review and a Central Office review, which Plaintiff was subject to here. ECF No. 108, p. 129 [sic]."); Dkt. No. 114 at 16 ("Plaintiff also mischaracterizes the Superintendent Defendants' ministerial role in reviewing the package of paperwork prepared by their facility's review committee to ensure completeness, conveying the package to Central Office, and being responsive to questions from the final decisionmakers to be substantive participation in the decision-making. [ECF No. 108] pp. 29-33.").

Merely citing to where in Pearson's opposition papers that they believe an error or mistake exists is not the same as defendants stating what the error or mistake is, explaining *why* it is incorrect or wrong, or, crucially, why the supposed error or mistake even matters.

At bottom, defendants contend that Pearson's argument is this: "[A] jury could conclude that the Superintendent Defendants had a substantive, rather than ministerial, role in the Ad Seg review process." Defs.' Reply, Dkt. No. 114 at 16. According to defendants, "[f]or reasons explained in Defendants' opening brief, Plaintiff's assertions are belied by the record[.]" Defs.' Reply, Dkt. No. 114 at 16. For starters, the Court vehemently disagrees that defendants *explained* anything of the sort—stated it, certainly; shown it, not in the least.

Further, defendants' argument amounts to an assertion that the Superintendent defendants were not "personally involved" because the "final determination whether to release an individual from Ad Seg lies with the Deputy Commissioner . . . alone." Defs.' Reply, Dkt. No. 114 at 17. If

12

that is the case, the Court does not know why, and defendants fail to explain.  *See* Dkt. No. 94-1 at 21 ("Defendants Colvin, Eckert, and Thoms, in their role as facility Superintendents, had no authority over the decision to retain or release Plaintiff . . . from confinement.") (citing Colvin Decl., Dkt. No. 94-17 ¶ 21; Thoms Decl., Dkt. No. 94-20 ¶ 21; Eckert Decl., Dkt. No. 94-16 ¶ 27); *but see* Colvin Decl., Dkt. No. 94-17 ¶ 21 ("*Ultimately*, I did not have any decision-making authority regarding whether the Plaintiff remained in, or was removed from, Central Office Ad Seg status while he was housed at Five Points.") (emphasis added); Thoms Decl., Dkt. No. 94-20 ¶ 21 ("*Ultimately*, I did not have any decision-making authority regarding whether the Plaintiff remained in, or was removed from, Ad Seg while he was housed at Mid-State or Five Points.") (emphasis added); Eckert Decl., Dkt. No. 94-16 ¶ 27 ("*Ultimately*, I did not have any decision-making authority regarding whether Plaintiff remained in, or was removed from, Ad Seg while he was housed at Wende.") (emphasis added).

Regardless, Pearson has introduced evidence suggesting that Colvin, Eckert, and Thoms "were involved in revising or disagreeing with reviews, sharing concerns about inmates with the review committee, overseeing the work of the review committee at the facility-level, and communicating with Central Office about inmates in Ad Seg," and that he attempted to raise his concerns regarding the review process with at least one of them directly via facility grievance procedures.  Pl.'s Resp., Dkt. No. 108 at 29–30.  Consequently, the Court finds that genuine issues of material fact remain as to the personal involvement of the three Superintendent defendants precluding summary judgment.

   i.   *Thoms' Personal Involvement*

Defendants further argue that the claims against Thoms specifically must be dismissed, "[s]ince Plaintiff was not housed at Five Points C.F. or Midstate C.F. during the times that Thoms

13

worked at each facility[;] [and therefore] Thoms could not have been personally involved in the decision to continue Plaintiff's Ad Seg confinement." Defs.' Reply, Dkt. No. 114 at 16 (citing "Thoms Decl. ¶¶ 17, 19, 6, 7, 9, 10, Exs. A, B.").

But Thoms' deposition testimony conveys much less certainty regarding this timeline. *See* Thoms Depo., Dkt. No. 94-9 at 6 ("Q: And what were the dates that you were at Five Points for? A: 2010 to 2017, I believe[.] Q: Okay. And what was your role at Five Points? A: Deputy superintendent for administration."); *id.* at 7 ("Q: And so after Five Points, where did you move to? A: I went to Great Meadow Correctional Facility. Q: [W]hat dates were you there? A: Either 2017, 2018 to — I think I'm getting my dates wrong, but I was there for like 14 months."); *id.* at 7 ("Q: And where did you go after Great Meadows? A: Mid-State Correctional Facility. Q: And what were the dates that you were at Mid-State? A: I think I was there—I got my dates all messed up. I was there to 2018. So there's some dates that are—yeah. Q: So just to clarify, were you at Great Meadows at one point and then you left and then went back to Great Meadows? A: No. Q: Okay. So when were you at Great Meadows? A: 2016. Q: [A]nd then when did you go from Great Meadows to Mid-State? A: 2017."); *id.* at 8 ("Q: When were— when exactly were you at Five Points? A: I was there from 2010, I think, to 2016."); *id.* at 8 ("Were you at Five Points at another point? A: Yes. Q: And when was that? A: I believe 2018 to 2020. Q: So during the period of 2018 to 2020, what was your role? A: Superintendent.").

Moreover, Thoms' NYSTEP employee history summary suggests that he began his time at Mid-State on December 22, 2016, and remained in that role until August 30, 2018. *See* Dkt. No. 94-20 at 8. His employment history summary, in fact, states Thoms' separation from Great Meadow occurred on December 22, 2016, as well. *See* Dkt. No. 94-20 at 8. Curiously, the document contains no indication that Thoms had any relationship with Mid-State prior to

14

December 22, 2016. *See id.* Yet a memorandum sent by Acting Commissioner Annucci on November 1, 2016, states that "[t]he following Acting Superintendent . . . appointment[] [is] effective Wednesday, November 2, 2016: Matthew Thoms: Acting Superintendent at Mid-State Correctional Facility." Dkt. No. 94-20 at 9. As does Thoms himself, in his declaration: "I served as the Acting Superintendent of Mid-State in November of 2016[.]" Thoms Decl., Dkt. No. 94-20 ¶ 6. The following month, December 2016, Thoms shed the "acting" status, and was appointed Superintendent of Mid-State. *See id.* ¶ 6. Also in his attached declaration, Thoms represents that he continued as the Mid-State C.F. Superintendent "until [he] became the Superintendent of Five Points." *Id.* ¶ 6. He additionally represents therein that he "served as the Superintendent of Five Points from August 2018 until July 2020." *Id.* ¶ 7.

To restate the above plainly: Thoms was the Superintendent of Mid-State Correctional Facility from November 2016 until August 2018.

Furthermore, Thoms, in his declaration, represents that "[p]laintiff was housed at Mid-State, in the Step-Down Program, from April 17, 2018, until August 13, 2019." *Id.* ¶ 10.[3]

Putting the two together: Pearson came to Mid-State in April 2018 and Thoms left Mid-State in August 2018. As far as the Court is aware, April 2018 (when Pearson's term in Mid-State began) comes before August 2018 (when Thoms' tenure as Mid-State Superintendent ended). Yet this deduction contradicts Thoms' statement later in the same declaration: "Plaintiff was not housed at Mid-State during my time as Superintendent of Mid-State." *Id.* ¶ 19.

Thoms also represents to the Court that,"[a]s Superintendent of Mid-State[,] I oversaw the Stepdown Program." *Id.* ¶ 25. This too clashes with Thoms' declaration: "I was not involved

---

[3] That Pearson was housed at Mid-State between April 17, 2018, and August 13, 2019, appears to reconcile with the Chronological History Display exhibit defendants attach to Thoms' declaration. *See* Dkt. No. 94-20 at 11; *see also* Dkt. No. 94-1 at 13 ("Plaintiff was housed at Mid-State Correctional Facility . . . beginning on April 17, 2018.") (citing "Thoms Decl., Ex. A").

in Plaintiff's placement in the Stepdown Program at Mid-State, as I was no longer

Superintendent at Mid-State when Plaintiff was transferred to the Stepdown Program there." *Id.*

¶¶ 19, 20.

> Defendants' motion for summary judgment states:
>
> Thoms was the Acting Superintendent of Midstate C.F. from November 2015 until January 2017, during which time Plaintiff was not housed at Midstate C.F. Thoms Decl. ¶ 6, Exs. A, B. Thoms was the Superintendent of Five Points C.F. from September 2018 until July 2020, during which time Plaintiff was not housed at Five Points C.F. *Id.* ¶ 7. Thoms was not a member of the Ad Seg review committee at the facility (or Central Office) level. *Id.* ¶¶ 15, 16, 20, 21; McCarthy Decl. ¶¶ 36, 37.

Defs.' Mot. Summ. J., Dkt. No. 94-1 at 14.

Paragraph 6 of Thoms' declaration, in fact, states that he began as Acting Director of

Mid-State in November 2016, not a year earlier, as written in the motion. Had it occurred alone,

this mistake may be forgivable as typographical error and not merit remark. However, as seen in

the excerpt of defendants' motion above, defendants skip mention of nearly *two years* of Thoms'

role or whereabouts. At minimum, disputed facts remain about when and where Thoms worked.

Thus, any argument that the claims against Thoms must be dismissed because he and Pearson

were never in the same place at the same time fails. A reasonable jury could find Thoms was

personally involved in plaintiff's claims.

### 2.    Fourteenth Amendment

Pearson claims that he was denied procedural due process. *See* Am. Compl., Dkt. No. 23

at 33–34. "To prevail, he must be able to demonstrate (1) that Defendants deprived him of a

cognizable interest in life, liberty, or property, (2) without affording him constitutionally

sufficient process." *Proctor*, 846 F.3d at 608 (internal citations and alterations omitted).

Defendants do not dispute that Pearson was deprived of a cognizable liberty interest in his Ad Seg confinement. *Cf.* Defs.' Mot. Summ. J., Dkt. No. 94-1 at 31 ("These periodic reviews 'ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale and that prison officials are not using Ad Seg as a pretext for indefinite confinement of an inmate.'") (quoting *Proctor*, 846 F.3d at 609). Therefore, the only issue for consideration is whether a reasonable jury could find that Pearson was not afforded constitutionally sufficient process.

Here, defendants' grounds for dismissal rest largely on arguments that mischaracterize the claim and avoid its central merits.

For instance, defendants contend:

> [T]o the extent that Plaintiff challenges the timeliness of [his] Ad Seg reviews or failure to allow for adequate notice, 'such failures to adhere strictly to state or institutional policy are not sufficient to establish a constitutional violation.' *H'Shaka*, 444 F. Supp. 3d at 373. Accordingly, that Plaintiff's reviews may not have been conducted every sixty days does not amount to a Fourteenth Amendment violation.

Defs.' Mot. Summ. J., Dkt. No. 94-1 at 32.

In response, Pearson emphasizes that the court in *H'Shaka* stated such a failure *standing alone* might not give rise to liability under § 1983. *See* Pl.'s Resp., Dkt. No. 108 at 20; *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 373 (N.D.N.Y. 2020) (citing *Sanders v. Gifford*, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014) (report-recommendation of Treece, M.J., adopted by Kahn, J.)). And no intellectually honest reading of Pearson's filings supports the claim that his argument is simply that defendants failed to follow a strict sixty-day schedule:

> Mr. Pearson's reviews were consistently done out of order, with the facility-level review beginning before the Central Office or Deputy Commissioner for Correctional Facilities had reviewed the prior (or sometimes several prior) reviews—sometimes months would pass before the higher-level reviews would even begin; other times, higher-level reviews occurred in extremely close

succession, i.e., mere days or weeks apart.  The timing of these reviews—which reflect that later reviews were submitted before earlier reviews could even be referenced—calls into question the meaningfulness of the review process.  A review from June cannot meaningfully report on Mr. Pearson's progress in recent months if it has no prior report to reference.  Likewise, reviews completed within days or weeks of each other do not provide a meaningful measure of progress.

Pl.'s Resp., Dkt. No. 108 at 18–19.

Defendants ignore these points and instead continue misrepresenting or misunderstanding the matter.  *See* Defs.' Reply, Dkt. No. 114 at 9–10 (Section II.A, titled "Purportedly Untimely Reviews Do Not Amount to a Constitutional Violation") (concluding "that Plaintiff's review may not have been conducted every sixty days does not amount to a Fourteenth Amendment violation").

Pearson "does not dispute that Defendants provided him with a significant *amount* of process by conducting [numerous] multi-tiered reviews during his relevant period of solitary confinement." *Walker*, 146 F.4th at 252.  However, "the Due Process Clause requires more than going through the motions—the process must be provided 'at a meaningful time and in a meaningful manner.'" *Walker*, 146 F.4th at 252 (quoting *Proctor*, 846 F.3d at 609).

"'Meaningful' review is not sham review; reviewing officials must 'actually evaluate' whether the relevant individual '*remains* a security risk,' and in doing so, they must 'look to [the person's] present and future behavior and consider new events to some degree.'" *Walker*, 146 F.4th at 252 (quoting *Proctor*, 846 F.3d at 610–11).  "Meaningful Ad Seg review is grounded in current, safety-related considerations and does not validate Ad Seg imposed simply as a 'punishment for past transgressions.'" *Walker*, 146 F.4th at 252 (quoting *Proctor*, 846 F.3d at 611).

Defendants assert that their "sort of review"—that is, "considering Plaintiff's past conduct in conjunction with his current behavior and attempt[ing] to predict future behavior"—"is exactly the type of comprehensive review the *Proctor* decision seeks."  Dkt. No. 94-1 at 36.

As for Bellnier and O'Gorman ("Deputy Commissioner defendants"), defendants profess that any argument that the two merely rubber-stamped Pearson's reviews "fails to consider the gravity of the work [] Bellnier and O'Gorman undertook when assessing these reviews, which extend[ed] far beyond simply signing a document."  Dkt. No. 94-1 at 33.  Ostensibly, defendants claim, "both individuals looked at more than just the incident that put Plaintiff in Ad Seg—although the severity of that offense was certainly part of the consideration."  Dkt. No. 94-1 at 33 (citing "O'Gorman Decl. ¶¶ 29–30, 38, 40; Bellnier Decl. ¶¶ 18, 19, 26, 27").  But defendants cherry-pick excerpts from O'Gorman's declaration and deposition to support their claim that he showed meticulousness when conducting Pearson's reviews.  For instance,

> O'Gorman testified: "We are looking at the overall, his ability to get along with others, his interaction with staff, his interaction with other inmates, the condition of his cell, what he was doing, what he engaged in, his behavior, looking at his, whether he got misbehavior reports or not.  There's a multitude of factors that go into it including talking to other staff members that have direct contact with that set individual.  So there's not a specific litmus test to say yes he meets these criteria so we're going to keep him in or let him go.  It's an overall general review of everything that's happened since the previous review."

*See* Defs. Mot. Summ. J., Dkt. No. 94-1 at 33 (citing O'Gorman Depo., Dkt. No. 94-6 at 6).  Yet this argument is undercut by O'Gorman's own testimony:

> [U]nfortunately I don't remember Mr. Pearson, a specific Ad Seg review[,] or his reviews during that period.  So, I mean I can give you general descriptions of what I looked at for everybody.  I can't give a specific on Mr. Pearson though[.]

O'Gorman Depo., Dkt. No. 94-6 at 6.

On the other hand, the Deputy Commissioners' decisions—as stated on Pearson's Ad Seg reviews—suggest a dearth of consideration on their part, such that a reasonable jury could find

19

that Bellnier and O'Gorman served as mere rubber-stamps.  *See, e.g.*, Decision of the Deputy Commissioner for Correctional Facilities, Dkt. No. 97-1 at 1 ("Based on all of the above, including your history of extreme violence and attempted escape, mandates your retention in Administrative Segregation at this time."); Dkt. No. 97-5 at 3 ("Upon review of all the above facts, your release from Administrative Segregation is an unacceptable risk to the safety and security of the facility."); Dkt. No. 97-16 at 1 ("All available information, including the above noted review, dictates a continuation of Administrative Segregation status at this time."); Dkt. No. 97-17 at 1 ("As noted above in sections A and B with regard to specific facts, your continuation in Administration [sic] Segregation is necessary at this time."); Dkt. No. 97-19 at 1 ("Upon reviewing all the facts provided, your retention in Administrative Segregation is warranted at this time.").[4]

Moreover, large portions of Pearson's reviews "were 'virtually identical,' reflecting 'repetitive and rote' explanations from which a reasonable jury could conclude that his reviewers 'treated the process as satisfied by boilerplate explanations instead of a forthright review.'" *Walker*, 146 F.4th at 252 (quoting *Proctor*, 846 F.3d at 613).  Some reviews repeated the same typographical errors or mistakes as earlier ones, suggesting they were copied and pasted with little thought.  *See, e.g.*, Dkt. Nos. 97-26, 97-34, 97-36, 97-44, 97-52, 97-57 (writing Pearson's affect was "matter-of fact [sic]"); Dkt. Nos. 97-28, 97-38, 97-61, 97-64 (stating Pearson was present for "his mothers' [sic] murder"); *see also* Dkt. No. 97-29 (February 2011 note from Pearson clarifying that "my mother died due to illness") *and* Dkt. No. 97-29 (March 2011 note from central committee chastising facility "to only provide information that is necessary and

---

[4] And at least one review in the record suggests that the Deputy Commissioner denied Pearson's release from Ad Seg *before* even receiving the Central Office committee's summary report and recommendation. *See* Dkt. No. 97-6 at 1 (Decision of the Deputy Commissioner dated "5/9/07"; Central Office committee recommendation dated "May 14, 2007").

pertinent"); *see also* Dkt. No. 97-61 at 6 ("He completed a Pre-Aggression Workbook Program in September, 2015."); *but see id.* at 4 ("On 9/9/12 he completed a Pre-Aggression Workbook Program at Upstate") *and* Dkt. Nos. 97-66, 97-69, 97-73,  ("On 9/9/12 he completed a Pre-Agression [sic] workbook program").

As the Second Circuit has commented in *Walker* and *Proctor*, "repeated careless errors in documentation and rote application of Ad Seg's purported justifications [can be] evidence of meaningless reviews." *Walker*, 146 F.4th at 254 (quoting *Proctor*, 846 F.3d at 613).

Further, "a reasonable jury could also find that the Facility Committee's use of virtually the same two-sentence justification" for Pearson's continued Ad Seg, in nearly every review in the record conducted over the course of twelve years, provides support for his argument that he was not afforded meaningful process. *See Walker*, 146 F.4th at 254; *see also* Dkt. Nos. 97-4 – 97-9, 97-17 – 97-75 ("The callousness and severity of his criminal history coupled with his total disregard for authority places all that come into contact with him at great risk.  It is strongly recommended that inmate Pearson remains in Administrative Segregation").

"[A] reasonable juror confronted with evidence that an official is discounting good behavior by attributing it to the conditions of Ad Seg might conclude that the official was conducting a meaningless review with a predetermined outcome." *Walker*, 146 F.4th at 258 n.53 (collecting cases); *see, e.g.*, Dkt. No. 97-8 ("On the surface, inmate Pearson appears to be relatively docile towards correctional staff."); Dkt. No. 97-9  ("On the surface, security reports that Pearson is quiet, but however [sic] his recent misbehavior reports denote possible ongoing security concerns."); Dkt. No. 97-15 (Review from September 2008) ("Security states that inmate Pearson keeps to himself and is not a problem.  Although there are no infractions on inmate Pearson since 8/06 this can be due to his limited access to other individuals because he is

21

single celled."); Dkt. No. 97-34 (Review from December 2011) ("Pearson was transferred to Upstate SHU on 4/14/06[.]  Since his transfer to Upstate, Inmate Pearson has not received any misbehavior reports however, Inmate Pearson is single celled and appears to be an opportunist."); Dkt. No. 97-62 (Review from January 2016) (same).

The above is not the only evidence in the record that could lead a reasonable juror to conclude that defendants' review was not meaningful.  *See Walker*, 146 F.4th at 251–65.  But it is enough to demonstrate that genuine issues of material fact preclude summary judgment on Pearson's due process claim.

> **3.    Eighth Amendment**

Defendants seek summary judgment on Pearson's claim that they violated his Eight Amendment rights by subjecting him to more than a decade of solitary confinement without legitimate penological justification.

"The Supreme Court has held that '[c]onfinement in a prison or in an isolation cell,' such as Ad. Seg., 'is a form of punishment subject to scrutiny under Eighth Amendment standards.'" *Booker v. Griffin*, 2024 WL 756166, at *12 (S.D.N.Y. Feb. 23, 2024) (quoting *Hutto v. Finney*, 437 U.S. 678, 685 (1978)).  However, "[g]enerally speaking, confining an inmate in SHU, without more, and notwithstanding the restrictions that such confinement imposes on inmate life, does not constitute cruel and unusual punishment."  *Madison v. Crowley*, 2020 WL 2542636, at *13 (W.D.N.Y. May 19, 2020) (citing *Bowens v. Smith*, 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013)).  "[W]hether incarceration in the SHU violates the Eighth Amendment . . . depends on the duration and conditions of the confinement."  *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015).

22

Thus, "[a] plaintiff asserting an Eighth Amendment claim related to the conditions of his confinement must satisfy both objective and subjective tests: (1) to satisfy the objective test, 'a plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs' such that the conditions 'pose an unreasonable risk of serious damage to his health'; and (2) to satisfy the subjective test, 'a plaintiff must demonstrate that the defendants imposed the conditions with deliberate indifference,' meaning that the defendants knew of, and disregarded, 'an excessive risk to the plaintiff's health or safety.'" *H'Shaka*, 444 F. Supp. 3d at 377 (quoting *Rasheen v. Adner*, 356 F. Supp. 3d 222, 240 (N.D.N.Y. 2019).

"Regarding the Objective Test, to defeat summary judgment, the undisputed facts on the record must show 'objectively, sufficiently, serious . . . denial of the minimal civilized measure of life's necessities.'" *Booker*, 2024 WL 756166, at *13 (quoting *Willey v. Kirkpatrick*, 801 F.3d 51, 66 (2d Cir. 2015)). "The Objective Test can be satisfied based on the length of the confinement, such that the effects are 'grossly disproportionate' to the reasons for the isolation." *Booker*, 2024 WL 756166, at *13; *Peoples v. Fischer*, 898 F. Supp. 2d 618, 625–26 (S.D.N.Y. 2012) ("Numerous courts have found that long stretches of segregation can constitute cruel and unusual punishment.") (collecting cases).

"As for the Subjective Test, keeping an inmate in solitary confinement without sufficient 'penological justification' can alone demonstrate deliberate indifference." *Booker*, 2024 WL 756166, at *13 (citing *H'Shaka*, 444 F. Supp. 3d at 380). "This is in part because of 'the fact that the risk of harm is obvious' when an inmate is kept in solitary confinement for extended periods of time." *Booker*, 2024 WL 756166, at *13 (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)); *see Walker*, 146 F.4th at 238 ("The negative effects of solitary confinement on a person's mental,

23

physical, and emotional state are well-documented and can be devastating.  [A]s of 2014, individuals in solitary confinement in the New York prison system were approximately seven times more likely to harm themselves than prisoners in the general population.  The effects are so severe that the United Nations Special Rapporteur on Torture concluded that the use of solitary confinement itself can amount to torture as defined in article 1 of the Convention against Torture[.])" (internal citations and alterations omitted).

"[E]ven if Plaintiff's past violent behavior provides a possible penological justification, there is a point at which circumstances (i.e., the amount of time in Ad. Seg. and the inmate's behavior during that time) reasonably suggest that such justification is no longer legitimate." *H'Shaka*, 444 F. Supp. at 380.  "Accordingly, if Plaintiff's continued confinement in Ad. Seg. was based on past violent conduct alone and Defendants failed to take into account the lack of more-recent serious disciplinary infractions, Plaintiff could succeed on his Eighth Amendment claim." *Booker*, 2024 WL 756166, at *13.

"Regarding the Subjective Test, as discussed earlier in this opinion, there is a genuine dispute of material fact regarding whether the Defendants were relying solely on Plaintiff's past conduct when deciding to hold him in Ad. Seg." *Id.*  "As a result, there is also a genuine dispute of material fact as to whether the Defendants had a legitimate penological justification for holding Plaintiff in Ad. Seg. for the purposes of the Eighth Amendment." *Id.*  "Plaintiff's Eighth Amendment claim is thus 'intertwined with his procedural due process claims'—in other words, if Defendants failed to provide meaningful review of Plaintiff's status . . . and instead retained him in solitary 'for solely punitive reasons, his right to due process and his right to be free from cruel and unusual punishment are both implicated.'" *Id.* (quoting *Smith v. Annucci*, 2019 WL 539935, at *7 (W.D.N.Y. Feb. 11, 2019)); *see also* Defs.' Mot. Summ. J., Dkt. No. 94-1 at 22 n.4

24

("Importantly, Plaintiff's conditions of confinement claim is wholly intertwined with his placement in Ad Seg, i.e., had Plaintiff not been in Ad Seg, he would not have suffered under these conditions.").

Pearson's Eighth Amendment claims therefore turn on unresolved questions of fact— "namely, whether the Defendants have put forth a sufficient penological justification for Plaintiff's years-long confinement." *Booker*, 2024 WL 756166, at *13. As a result, defendants' motion for summary judgment as to this claim is denied.

### 4.     Qualified Immunity

"[Q]ualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"There are therefore two steps to the qualified immunity analysis: first, whether the plaintiff established that his constitutional rights were violated, and second, whether the right at issue was 'clearly established' at the time of the alleged violation." *Bacon v. Phelps*, 961 F.3d 533, 542 (2d Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Defendants bear the burden of showing that they are entitled to qualified immunity. *See Guan v. City of New York*, 37 F.4th 797, 806 (2d Cir. 2022).

"Summary judgment is unavailable when the parties dispute facts material to the question of qualified immunity." *Owens v. Figueroa*, 2026 WL 161320, at *6 (D. Conn. Jan. 21, 2026) (quoting *Walker*, 146 F.4th at 264).

"Since *Hewitt*, it has been clearly established that 'administrative segregation may not be used as a pretext for indefinite confinement[.]'" *Walker*, 146 F.4th at 264 (quoting *Hewitt v.*

*Helms*, 459 U.S. 460, 477 n.9 (1983)).  If, as plaintiff alleges, defendants knowingly confined him in administrative segregation for over a decade "strictly for punitive reasons and without penological justification, the Court cannot conclude, at this stage of the proceedings, that qualified immunity would shield those actions."  *Smith*, 2019 WL 539935, at *7 (internal citations omitted).

### 5.    Timeliness of Claims

"In Section 1983 actions, the applicable statute of limitations is the State's 'general or residual statute for personal injury actions.'"  *Woods v. Martuscello*, 2024 WL 3567149, at *8 (N.D.N.Y. July 29, 2024) (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002)). "In New York, a three-year statute of limitations applies for personal injury actions and thus to Section 1983 actions."  *Woods*, 2024 WL 3567149, at *8; *see also* N.Y. C.P.L.R. § 214(5).

This action commenced on September 25, 2020, and the complaint is dated September 23, 2020.  *See* Compl., Dkt. No. 1 at 27.  However, "New York Executive Order 202.8, which was issued on March 20, 2020, tolled the time limits for filing legal actions from March 20, 2020 through November 3, 2020."  *Woods*, 2024 WL 3567149, at *9 (citing *White v. Gutwein*, 2023 WL 5803708, at *3–4 (S.D.N.Y. Sept. 6, 2023)).  "Thus, any claims that accrued prior to March 20, 2017 are time-barred, while claims accruing after March 20, 2017 are not."  *Woods*, 2024 WL 3567149, at *9.

Evidence submitted by defendants, at the Court's request, indicates that Bellnier retired on September 5, 2017.  *See* Dkt. No. 128.  Defendants also state that Bellnier's "final authorization of Plaintiff's Ad Seg confinement occurred in August 2017."  Defs.' Mot. Summ. J., Dkt. No. 94-1 at 39 (citing Bellnier Decl., Dkt. No. 94-18 at 1; Dkt. No. 97-69); *see also* Dkt. No. 97-69 (bearing Bellnier's signature, dated August 17, 2017); Defs.' Reply, Dkt. No. 114 at 15

26

("From November 2011 until his retirement in September 2017, Defendant Bellnier was responsible for the review of Plaintiff's Ad Seg status.").

Accordingly, Pearson's procedural due process claim against Bellnier remains viable and will proceed.

### B.    Motion to Exclude Expert Testimony

On April 18, 2025, the same date that defendants moved for summary judgment, Pearson moved under Federal Rule of Evidence 702 to preclude defendants' expert, Dr. Jacqueline Bashkoff. *See* Dkt. No. 95.

In turn, defendants requested the dismissal of Pearson's motion to preclude Dr. Bashkoff's testimony as untimely, or, in the alternative, asked that the deadline for defendants' response to the *Daubert* motion be held in abeyance pending resolution of defendants' summary judgment motion. *See* Dkt. No. 99 at 1. Judge McAvoy, acknowledging that Pearson's motion would be moot if defendants' motion was granted, declined to dismiss Pearsons' motion; in lieu, Judge McAvoy stayed additional briefing on expert testimony preclusion "until the Court resolves the summary judgment motion." Dkt. No. 102.

"Where, as here, summary judgment relief is not warranted 'irrespective of the admissibility of the [party's] expert[], . . . it is not necessary to reach the . . . *Daubert* motion[] at this juncture." *EEOC v. Hunter-Tannersville Cent. Sch. Dist.*, 2026 WL 493945, at *20 (N.D.N.Y. Feb. 23, 2026) (quoting *Henessey Food Consulting LLC v. Prinova Sols., LLC*, 2024 WL 4291312, at *16 (N.D.N.Y. Sept. 24, 2024) (collecting cases)).

Accordingly, the motion to preclude expert testimony is denied without prejudice to be renewed *in limine*, if warranted.

27

## V.   CONCLUSION

Having considered the briefing from the parties and the remainder of the record, the Court hereby finds and **ORDERS**:

(1) Defendants' Motion for Summary Judgment (Dkt. No. 94) is **GRANTED IN PART** and **DENIED IN PART**.  The claims against Annucci, Koenigsmann, and Morley are **DISMISSED WITH PREJUDICE**, and those defendants are **DISMISSED** from this action.  Pearson's claims against defendants Bellnier, O'Gorman, Colvin, Eckert, and Thoms will proceed to trial.

(2) Pearson's motion to preclude Dr. Jacqueline Bashkoff (Dkt. No. 95) is **DENIED WITHOUT PREJUDICE**.

**SO ORDERED.**

Dated: March 27, 2026

       Utica, New York

Anthony J. Brindisi
U.S. District Judge